## Altoona & Philipsburg Connecting Railroad Company v. Beech Creek Railroad Company and New York Central & Hudson River Railroad Company, Appellants.

*Railroads—Railroad connection—Act of April 4, 1868.*

The act of April 4, 1868, P. L. 62, which permits a railroad company to connect its railroad with roads of a similar character, contemplates a mechanical connection with a road of similar gauge, so as to permit the running of cars from one road to the other.

*Railroads—Railroad connections—Act of April 4, 1868—Province—Jury of view.*

Under the act of April 4, 1868, the jury of view appointed to fix the terms upon which two railroads may be connected with each other have authority only to pass upon matters relating to the physical connection of the two roads, such as the point at which one of the roads must be broken, what switches and sidings shall be constructed by the road seeking the connection, what watchmen or other employees shall be appointed to guard against danger, and which roads shall appoint and pay them.  The jury has nothing to do with carrying out the purposes of the connection, and it is beyond its power to order one company to transfer to the other, whether with or without compensation, its lands, right of way, station, yards, water, joint control of part of its road, or other valuable property or franchises.

*Railroads—Eminent domain—Prior grant.*

Every grant by the sovereign is upon the implied condition that it is not to be exercised to the injury of an older one.

Argued April 21, 1896. Appeal, No. 58, July T., 1895, by defendants, from order of C. P. Clearfield Co., Dec. T., 1893, No. 425, overruling exceptions to report of jury of view. Before STERRETT, C. J., McCOLLUM, MITCHELL, DEAN and FELL, JJ. Reversed.

Exceptions to report of viewers.

From the record it appeared that on November 4, 1893, the plaintiff filed a petition for the appointment of viewers to determine and fix the terms of the connection of the Altoona & Philipsburg Connecting Railroad with the Beech Creek Railroad. Three viewers were duly appointed, and on November 24, 1893, they filed a report, the substance of which, with other facts, is stated in the opinion of the Supreme Court.

Exceptions to the report were overruled, and the report was approved by the court, KREBS, P. J.

*Error assigned* was in approving the report.

M. E. Olmsted, with him Murray & Smith, for appellants — In this case the jury has attempted to impose terms upon defendants as well as upon plaintiff, and to determine and regulate most important matters entirely outside of and not necessarily connected with the mere establishment of a connection between the railroads. The terms which the jury might, in a proper case, properly determine and fix, would be the terms upon which the physical connection should be established.

Railroad connection, without qualifying terms, means either such a union of tracks as to admit the passage of cars from one road to the other, or such intersection of roads as to admit the convenient interchange of freight and passengers at the point of intersection: Phila. & Erie R. R. v. Catawissa R. R., 53 Pa. 20; A., T., etc., R. R. v. D. & N. O. R. R., 110 U. S. 667.

This court is authorized to review the matter, and the proper mode of asserting its jurisdiction is by bringing up the record by certiorari: Commissioners of Northampton County's App., 57 Pa. 452; Commissioners v. Fickenger, 51 Pa. 48.

*J. B. McEnally*, with him *D. W. McCurdy*, for appellees.—
The right of connection is given by law. Also the right to
have the terms of connection fixed promptly and conclusively.
But the law does not undertake to fix or define what the terms
shall be. The reason is evident. The terms of connection
are not a matter of law, but a mere business arrangement, to
be adjusted on business principles in the power of the parties,
which will vary according to the situation and circumstances.

Railroad connection without qualifying terms may mean lit-
tle more than a physical connection, but terms of connection
comprise all those arrangements which may properly be adopted
to make the connection safe, convenient, and advantageous to
the public and the parties. It may be said to comprise all that
is reasonably necessary under the particular situation to accom-
plish such purpose. But no court has undertaken to specify
just what may or may not be included.

The terms of connection, which were approved by the court,
called for immediate and continued action by each party in ful-
fillment of its provisions. It was like an executory contract in
which each party was an actor from that time on. Each party
was entitled to know at once if the other denied its validity
and repudiated its provisions. A failure to except would imply
acquiescence or assent. And if both parties not only acquiesced,
but immediately went on to make a railroad connection in ac-
cordance with its terms and provisions, it would become as com-
pletely the contract of the parties as if it had been formally
made and executed by themselves: Crosby v. Massey, 1 P. &
W. 231; Brown v. Honneter, 16 Serg. & Rawle, 138; Mc-
Farland v. Commissioners, 12 Serg. & Rawle, 297; Ins. Co. of
Penna. v. Phœnix Ins. Co., 71 Pa. 31; Headley v. Renner, 129
Pa. 545; Ins. Co. v. Ins. Co., 71 Pa. 31; Swanson Street, 163 Pa.
323; 1 Greenl. Ev. sec. 19; 19 Am. & Eng. Ency. of Law, 49;
Beale v. Com., 25 Pa. 18.

Opinion by Mr. Justice Dean, October 5, 1896:

The plaintiff desired to connect its railroad with that of the
Beech Creek, the latter being leased to and operated by the
New York Central; the connection to be made under the provis-
ions of the 11th section of the act of April 4, 1868, as follows:

" Companies whose roads shall be constructed under the pro-

visions of this act shall have the right to connect their roads with roads of a similar character within this commonwealth or at the line thereof, upon such terms as may be agreed upon by those who have the management of said roads; and in case of failure of an agreement on the part of those having the management of said roads, then and in that case either of said parties may apply to the court of common pleas within the jurisdiction in which said connection is proposed to be made, whose duty it shall be to appoint a jury of three disinterested men, who shall determine and fix said terms, which, when approved by said court, shall be conclusive."

As terms for the connection could not be agreed upon, the plaintiff petitioned the court on 4th of November, 1893, for the appointment of three disinterested men to determine and fix the terms; thereupon, the same day, the court made the appointment as prayed for. The jurors met, viewed the premises in presence of representatives of both railroads, heard evidence and reported that they had fixed the point of connection for the roads opposite Wigton's fire brick works. They then further reported: 1. That plaintiff should have, as part of its property, a strip of defendant's land for a distance of sixteen hundred feet by sixty-six feet, extending south from point of connection, and should pay defendant therefor the sum of $16,600, within three years, with interest, and on full payment defendant should by deed convey the land to plaintiff. 2. The jurors further directed that from the point of connection for a distance of twenty-three hundred feet north, the plaintiff should have the right to use defendant's road for the purpose of reaching Phillipsburg station with its freight and passengers, and should further have needed terminal facilities, subject, however, to the prior right of defendant; further, plaintiff was awarded the right to construct on defendant's right of way such further sidings as it might need; further, plaintiff was to have the joint use with defendant of its station, yards and water-tanks. 3. For these rights thus awarded, plaintiff was directed to pay defendant annually the sum of $930. 4. These terms to continue for ninety-nine years, unless sooner ended by the parties. The costs of the proceedings to be paid by plaintiffs.

This report was approved by the court below November 25, 1893, and defendants took this writ of certiorari, assigning three

errors, only one of which calls for notice. It is argued the jurors exceeded the jurisdiction and powers conferred on them by the act of assembly heretofore quoted in determining matters wholly unrelated to the connection of roads of a similar character. The act is very indefinite as to the extent of the powers of the jurors. And although we have no authority in our own state directly in point, the late case of Atchison etc. R. R. v. Denver etc. R. R., 110 U. S. 667, has weight in determining what is meant by a right to " connect." The constitution of Colorado provides, " that every railroad company shall have the right . . . . to connect . . . . with any other railroad." It was held by the court, this only implies a mechanical union of the tracks of the roads, so as to admit of the convenient passage of cars from one to another. It was further held, that to constitute such connection, the road with which the connection was made, in the absence of statutory provision, was not bound to go further and construct stations for the accommodation of the new business.

In the case of Philadelphia & Erie Railroad v. Catawissa Railroad Co., 53 Pa. 20, the plaintiff denied the right of defendant to build a four feet eight and one half inch gauge railroad to connect with the Atlantic & Great Western Railroad of six feet gauge. The act of 1861 directed: " That the roads of the companies, so constructing or leasing, shall be directly or by means of intervening railroads, connected with each other." It was argued, there could be no connection within the meaning of the act of roads of different gauges, for there could be no transfer of cars from one to the other. But this court held: " We conform ourselves to Pennsylvania legislation when we define a railroad connection to mean, where no supplementary terms are used, either such a union of tracks as to admit the passage of cars from one road to the other, or such intersection of roads as to admit the convenient interchange of freight and passengers at the point of connection." Therefore, it was decided that under the act of 1861, the broad could connect with the narrower gauge by an intersection merely, for interchange of freight and passengers. But the act before us, under which this connection is sought, gives the right to connect with roads of a " similar character." The obvious meaning of this is a mechanical connection with a road of similar gauge so as to per-

mit the running of cars from one road to the other. If the parties could not agree, then the jurors were to fix the terms for such connection as would make possible an interchange of traffic without transfer of goods from the cars of one road to the cars of the other. This would naturally be to the advantage of both roads, and to the general public as well. In most cases, the road seeking a connection would be a new one with an older, as here ; the defendant's road had been located and in operation for years ; the plaintiff was seeking to exercise its franchise under a much later grant. Now, it is a cardinal rule of interpretation, where there is an apparent antagonism, that every grant by the sovereign is upon the implied condition that it is not to be exercised to the injury of an older one. Unless there was a plain legislative mandate here, authorizing the transfer to plaintiff of part of defendant's road, station, management, lands, water and privileges, the jurors could not award such transfer. Not only is nothing of this kind expressly authorized, but it is not even remotely implied. The general act of 1849 contemplated the use of the railroad by transporters with their own cars, just as canals had been previously used, and provided that the kind of cars used should be specified by the railroad managers, and their transportation should be wholly under the control and direction of the same managers, to whom authority was given to fix rates of toll for such transportation. This method of carrying met with but little favor from the public ; except to a limited extent, the railroad companies became the transporters, owning the cars and motive power, and fixing rates for shippers instead of tolls for transporters. With the increase of railroads, to all engaged in the business of maintaining a public highway and in transporting freight and passengers, connections became desirable, not only to avoid the transfer of freight from one car to another, but to facilitate an interchange of passenger traffic at points convenient to the public. And while the act of 1868 antedates our present constitution six years, and leaves the purpose of such connection wholly to implication, yet the constitution, having the same purpose clearly in view, definitely expresses it thus : section 1, article XVII. on railroads, " Every railroad company shall have the right with its road, to intersect, connect with, or cross any other railroad ; and shall receive and transport each

the other's passengers, tonnage and cars, loaded or empty, without delay or discrimination."

This not only established as a constitutional right a connection which had been given by the acts of 1849, 1861 and 1868, but the object of the connection was not left to implication; the constitution went further, and expressly defined it; the purpose was to enable the companies to transport each the other's cars, loaded or empty, without delay or discrimination. While transfer of traffic was to the interests of the connecting roads, the larger interests of the public demanded such connection. As this was the manifest purpose, what, so far as concerns the immediate connection, will effect the purpose? The act has nothing to do with the duties enjoined upon the railroad companies after the connection is made. What methods they shall adopt to facilitate the receipt and transportation of each other's cars without delay or discrimination, is peculiarly within the domain of railroad management. It may be fairly presumed trained railroad officers will be able to perform a plain legal duty, such as here enjoined, and which can only be intelligently performed after the connection is made, more effectively than jurors or courts; if they neglect or refuse, the courts are open to compel them. But to perform the duty, there must be first a physical or mechanical connection; the plaintiff asks it, and defendants either refuse, or the two cannot agree upon the terms. Before there can be a physical connection, what terms must be agreed upon or fixed by the jurors? The track of the older must be broken. At what point? This is a matter of judgment in view of the surroundings and relative location of the two roads. What switches and sidings shall be constructed by the road seeking a connection so as to render the transfer of traffic speedy and safe? What watchman or other employees shall be appointed to guard against danger, and which road shall appoint and pay them? These and like matters, relating solely to the physical connection of the two roads, are the terms to be fixed by the jurors. They have nothing to do with carrying out the purpose of the connection. It is clearly beyond their power to order defendants to transfer to plaintiffs, whether with or without compensation, its lands, right of way, station, yards, water, joint control of part of its road, or other valuable property or franchise. Such power as this to appropriate one cor-

poration's property for the benefit of another has not been granted; it cannot, on any principle of justice, be implied.

Therefore, the decree of the court below is reversed, and report of jurors set aside at costs of plaintiff.