Martin-Howe Coal Company, Defendant in Error, v. Illinois Central Railroad Company, Plaintiff in Error.

### Gen. No. 13,870.

COMMON CARRIERS—*obligation with respect to reconsigning orders.* A carrier accepting a shipment to a point on its own line, in the absence of a special promise or a universally recognized

custom, is not bound to obey a reconsigning order directing the delivery of the merchandise in carriage to another road with which it makes physical connection at the consigned point, such a reconsigning order involving either the sending of its own cars beyond its line or the unloading and reloading of such merchandise.

Action of contract.  Error to the Municipal Court of Chicago; the Hon. OSCAR M. TORRISON, Judge, presiding.  Heard in this court at the October term, 1907.  Reversed and judgment here.  Opinion filed July 6, 1908.

V. W. FOSTER, and CALHOUN, LYFORD & SHEEAN, for plaintiff in error; JOHN G. DRENNAN, of counsel.

CLITHERO & BELL, for defendant in error.

MR. JUSTICE BROWN delivered the opinion of the court.

The Martin-Howe Coal Company, a corporation, in a trial without a jury, secured a judgment against the Illinois Central Railroad Company in the Municipal Court of Chicago on July 20, 1907, for $141.20 and costs.  To reverse this judgment and to secure one for $14.59 in its favor on a claim of set-off filed by it in the suit, the Illinois Central Railroad Company has sued out a writ of error from this court.

The facts involved in the case are these: The Martin-Howe Coal Company is an Illinois corporation for mining and selling coal.  In the winter of 1906-07 it was shipping and selling coal throughout the Northwest.  It was the custom of the Company to ship coal from Chicago to the order of itself at some distributing point in the Northwest, like Peoria, Dubuque or St. Paul, and while the coal was en route, if orders were received from customers at places to which it could be more or less conveniently diverted, the Coal Company would order the Railroad Company which was carrying it so to divert it to the new or, as they called it, "final" destination.

In January, 1907 (about January 1st), the Martin-Howe Coal Company was the owner of fifty-six and

three-quarters tons of Hocking Valley coal, which cost it $3.20 a ton at Blue Island, near Chicago, on the Chicago Junction Railway, which answered for f. o. b. cars, Chicago, there being a transfer point there. The coal came from the east in open cars, but was by the Coal Company loaded into box cars of the Illinois Central Railroad Company at Blue Island and consigned by the Coal Company to its own order at Dubuque.

It is not the custom to issue bills of lading on coal cars, and there were none issued in this case. The custom is to issue an expense bill at destination and collect charges.

These box cars of coal were taken by the Illinois Central Railroad from the tracks of the Junction Railway and carried to Dubuque. They were cars Nos. 40096 and 36551.

On January 11, 1907, a day or two before the cars arrived at Dubuque, however, the Coal Company having sold the coal to the Hawkeye Elevator Company of Aberdeen, South Dakota, for four dollars per ton plus the freight from Chicago to Aberdeen, to be paid upon delivery of the coal at Aberdeen to said Hawkeye Elevator Company, in apparent pursuance of its custom before alluded to, sent an order by mail to the agent of the Illinois Central Railroad Company at Dubuque, as follows:

"Please deliver the following cars to Hawkeye Elev. Co.,

|  | Initials. | Car No. |
|---|---|---|
| Aberdeen, S. D. | I. C. | 40096 |
|  |  | 36551 |

Via M. & St. L. R. R.

MARTIN-HOWE COAL Co."

About four months before this time, on September 4, 1906, the Illinois Central Railroad Company, in consequence of a shortage of cars, which was general in the Northwest, had issued the following announcement, of which the manager or employe representing

the Coal Company in this matter had notice in January, 1907, at the time of these transactions:

> "Illinois Central Railroad Company.
> Office of Coal Traffic Manager.
> CHICAGO, September 4, 1906.

To all concerned:

Effective Saturday, September 15th, Illinois Central box and coal cars cannot be loaded or reconsigned to points on foreign roads except when for switch movement at junction points. All coal loaded on and after that date, and all coal at junction points for which reconsigning orders have not been given, will be subject to the above. Operators having orders for coal to points on foreign roads should order foreign cars through the local agents at the mines. Every possible effort will be made to secure foreign equipment for such loading.

> F. H. HARWOOD,
> Coal Traffic Manager."

On January 16, 1907, Mr. Harwood wrote the Martin-Howe Coal Co. that the agent of the Illinois Central Railroad Company had received the reconsigning order above set out, but that the Railroad Company could not "see their way clear to allow their cars to be reconsigned from Dubuque to Aberdeen, owing to shortage of cars on their line." He added: "Please see if you cannot dispose of these cars at some point on our line."

January 17, 1907, the Coal Company replied that they had no other orders to give. "Having," they say, "sold the coal at Aberdeen when the market was about 50 cents a ton higher than it is today, we respectfully request that you strain a point and act on the orders we have given. In this connection we will advise you that these two cars were loaded in Chicago here on the Junction, and it would have suited our convenience to have sent these cars out from Chicago over other roads, but we were anxious to live up to your rules and

were under the impression that you would allow your cars to go to M. & St. L. points."

On January 26, 1907, the Railroad Company advised the Coal Company that the cars loaded with coal consigned to the Coal Company were at Dubuque for disposition, and requested the Coal Company "to take this matter up and arrange to furnish our agent at Dubuque with immediate orders disposing of the cars. If you are unable to do this, please advise and we will dispose of the cars."

To this letter the Coal Company replied, under date of January 28th, in which they say: "We have given you the disposition of this coal almost two weeks ago," and that "if the coal is not forwarded as per our orders, we will render a bill for same to the Illinois Central Railroad."

To this again, the Railroad Company replied on January 29, 1907, advising the Coal Company that the cars could not be reconsigned to Aberdeen, and that it would be necessary for the Coal Company to furnish a disposition for the cars to some point on the line of the Illinois Central Road.

On February 7th, the Railroad Company requested advice in writing if the Coal Company could not dispose of the cars at a point on the Illinois Central Line, "in order," they say, "that we may dispose of the cars."

February 9th, the Coal Company wrote to the Railroad Company that since the latter had refused to act upon their orders they enclosed a bill to the Railroad Company for the coal and looked to them for payment.

On February 11th, the Railroad Company wrote to the Coal Company, referring to the restrictions on the use of their cars since September 15, 1906, stating that they could not make an exception in the present case, and permit the cars to run to Aberdeen, S. D. They also said: "We feel that as we have handled these cars to Dubuque, where they are now on hand, in accordance with billing which we received and ac-

cepted, that we have performed all of the obligations which we have assumed and we therefore request you again to give us disposition of the coal in the cars at Dubuque, or some other point on our line, paying all legitimate charges, such as car service, demurrages and reconsigning charges, giving this disposition not later than February 14th; otherwise we will be compelled to take the matter of disposition into our own hands. Our manner of disposing of the coal will be to sell it for the highest price obtainable, and if there are any net proceeds remaining after legitimate freight and demurrage charges have been satisfied, we will be very glad indeed to remit the amount to you, but we cannot see our way clear to entertain your bill for the value of the coal,'' etc.

To this in a final letter of the controversy (except one of inquiry later) the Coal Company replied:

''We do not deny your right to restrict the movement of your cars, but we do claim that we have a right to order our merchandise wherever we please. There are through rates named by your road to cover the shipment in question, and the law requires you to deliver our goods to the connecting line and request them to transfer the coal if you do not wish your cars to go further than that junction. You have now held this coal at Dubuque over thirty days after receipt of your orders, and we herewith advise you that if we are put to any loss through this delay on your part in forwarding this coal, we will hold you responsible for it. We feel that we know our rights in this case, and you can make the next move without waiting for February 14th, as we have given you the only disposition we intend giving on the coal.''

The correspondence which we have given shows clearly the diverse contentions of the parties, and but little more is necessary to complete the statement of the facts.

Aberdeen, South Dakota, is not on the Illinois Central Railroad. It is on the Great Northern Road.

The Illinois Central Railroad makes a physical connection with the Minneapolis & St. Louis Railroad (which is the road mentioned in the reconsigning order of January 11, 1907, as the M. & St. L. R. R.) at a point near Albert Lea, Minnesota, and runs its cars over the tracks of that road to Albert Lea. The Minneapolis and St. Louis Railroad connects with the Great Northern Railroad at a point between St. Paul and Minneapolis. The evidence shows that had the cars of the Illinois Central been transferred to the tracks of the Minneapolis & St. Louis R. R. Co. at this time, as is the custom in cases of shipments and reconsignments of this kind when there is no shortage of cars or congestion of freight traffic, there would have been great danger that the Illinois Central would not recover them again for several months, during which time they would have been used by other roads at a *per diem* compensation of twenty-five or fifty cents a day, their earning capacity on the Illinois Central being then many times that.

It is also shown by the evidence of Mr. Lenehan, the agent of the Illinois Central Railroad at Dubuque, that at the time he received the reconsigning order of January 11, 1907, he was under instructions from the coal traffic manager and the general superintendent of transportation of the Illinois Central not to allow any cars of the road to be moved to points off the line. He therefore did not comply with the directions or request of the Coal Company, but allowed the two cars to remain on the track at Dubuque until March 1, 1907. The correspondence before given intervened. February 27th, the coal was sold by the Illinois Central agent at Dubuque to a local coal dealer. The agent interviewed, he says, every coal dealer in the city of Dubuque and also large consumers of coal for domestic use, with the view of getting the highest price possible for the coal, and finally sold it for $3.50 a ton, which was the highest price offered. The aggregate sum received was $198.63. The freight charges of the

road amounted to $148.22, and demurrage charges to $65, being at the rate of $1.00 per day for the use of the cars on the track after forty-eight hours from their arrival at destination. This charge was the uniform car service charge on such shipments in that locality at that time. It is thus, as the Railroad Company claims, that a balance of $14.59 is due to it from the Coal Company. The judgment was, however, given in favor of the Coal Company for the value of the coal. It does not appear in the record how the exact amount was arrived at.

In argument it seems to be assumed that the amount —$141.20—was at the rate of four dollars a ton less certain freight charges between Ohio and Chicago. Why that measure of damages should have been selected, we do not know, as Mr. Gilmore for the Coal Company testified on both direct and cross-examination that his Company bought the coal f. o. b. Chicago, although in the one he put the cost at $3.50 and in the other at $3.20 a ton.

Mr. Lenehan, the Dubuque agent of the Railroad Company, testified that he did not receive any instructions from the Coal Company or anybody else to transfer the coal into other cars or to any yards or any place else, and that he had no means of transferring this coal to other cars; which he explained to mean that he had no cars to transfer it to. He further testified that neither the Martin-Howe Coal Company nor any other person ever offered to him at Dubuque cars of any other railroad into which to transfer the coal, or directed that he do so. To do this, he says, they would have to have had Great Northern cars set up alongside of the Illinois Central cars, so that the coal could be transferred by shovel at the cost of about 30 cents a ton. Great Northern cars, he said, would have to come from St. Paul to the transferring point near Albert Lea, and at that time it might have taken months to get them. He testified, however, that he did not make a demand for foreign equipment from

any other road for the purpose of making any such transfer.

No question is seriously raised as to the measure of damages claimed by the respective parties, and we think for practical purposes it may be properly assumed that if the Coal Company is right in its contention, $141.20 is the proper judgment in its favor, and that if it is wrong and the Railroad Company right on the main question involved, then the judgment in favor of the Coal Company should be reversed and judgment entered against it in favor of the Railroad Company for $14.59.

That main question is: Did the Illinois Central Railroad Company fulfill the obligations to the plaintiff imposed on it by special contract or by the common law; or did it violate those obligations and by that violation damage the defendant?

The obligation imposed on it by special contract, under the facts above set forth, was plainly only to carry the cars loaded with coal to Dubuque, Iowa, and *there* deliver them to the order of the plaintiff. It is not claimed that the Railroad Company ever accepted or specifically agreed to accept the shipment to go to any other place or order. Some evidence was offered tending to show that it had been a custom for the railroads in the Northwest to accommodate shippers by re-routing and changing the destination of the cars of coal going over their roads while they were en route, but nothing approaching such a recognized and universal custom as would read a promise to do so, at the option of the shipper, into every shipment, was suggested. And even if such a universally recognized custom had been proven to have existed prior to September 4, 1906, the announcement of that date by the Railroad Company that box and coal cars could not, after September 15, 1906, be reconsigned to points on foreign roads, brought to the notice of the Coal Company, would prevent the former custom from having

any effect whatever on the contract made in January, 1907, for the shipment of the coal in question.

The emphasis of the plaintiff's argument, however, is placed on the proposition that the common law duty of a carrier obliged the railroad, when the coal was in its hands and possession and nearing Dubuque, to accept and follow the reconsigning order of the plaintiff on January 11th.

That order was "to deliver the cars to Hawkeye Elevator Company at Aberdeen, South Dakota"—a point far off the Illinois Central Railroad. The words "via M. & St. L. R. R. Co." on the order were meant to signify the railroad over which this re-routing was to be made.

The plaintiff seems to concede in its argument here, as it did in its correspondence, that the defendant had the right to refuse to allow its cars to be sent from its tracks. This seems to us very nearly tantamount to a concession, which is in accordance with our view of the law, that the Railroad Company was not bound to accept or obey this reconsigning order. Had it been to a point on its own road, it would have been a different matter.

The plaintiff now insists that it was the coal in the cars, and not the cars themselves, with the contents, that they had a right to order to Aberdeen, and that the duty of the Illinois Central Railroad Company, in the event that it did not choose to send its cars on to a foreign track, was nevertheless to deliver the coal to the next carrier at the nearest convenient connecting point, in this case, Albert Lea. But we doubt very much if the idea of transshipment or of any expense for transshipment from one car to another, entered into the mind of the manager of the Coal Company when he gave the directions of January 11th. It was undoubtedly the cars that he expected transferred and sent to Aberdeen, as well as the coal. This was in accordance with the custom of the roads before the shortage of cars occurred, and either because he thought the new rule

adopted by the Railroad Company unfair and impracticable, or in ignorance of it, or in the hope that it would not be enforced in his case, he followed what had been his practice before the preceding September. This appears plainly enough to us to be so, both from the statement of the Coal Company that they were under the impression that the Railroad Company would allow its cars to go to M. & St. L. points, and from the fact that the Coal Company furnished no cars and attempted no arrangement with the Minneapolis & St. Louis Railroad or the Northern Railroad to furnish them at Albert Lea after it was announced to it that the cars of the Illinois Central would not leave the tracks of the Illinois Central. Nor did the Coal Company order the coal carried to Albert Lea or vicinity, and dumped from the cars at the Minneapolis & St. Louis tracks, with notice to that railroad of its desired destination—an order which it may be assumed they would have had a right to give and which would have been probably obeyed.

This plainly would not have served a useful or profitable purpose to the Coal Company, and what its manager did, therefore, was first to order the Illinois Central Railroad Company to forward their coal to Aberdeen in the cars in which it left Chicago, and afterwards to order it (by their letter of February 13th) to forward the coal to Aberdeen either in the cars in which it lay, or in other cars obtained by it for the purpose.

We have seen that it conceded that the Company had no right to demand from the Illinois Central Railroad Company, without its special contract to that effect, that it should forward its cars to Aberdeen. Had it any greater right to compel the Railroad Company, in the absence of its agreement to do so, to "forward" its coal? We think not. The common law obligation has not been extended in Illinois in this respect, by statute or otherwise. Rules have been laid down which indicate the duties and liabilities of carriers who, by

receiving goods marked for points beyond its line, or by other more specific agreements, undertake to forward such goods, but it has never been held that a railroad could not refuse to incur any further obligation than to carry goods to some point on its own line, and at such point on its own line "deliver," not "forward," them. As we have said, there is no reason to suppose that an order to carry the coal to Albert Lea and dump it would have been disobeyed, but no such order was given, or, in our opinion, thought of, and the Illinois Central R. R. Co. had the legal right to refuse to accept the order of January 11, 1906, which involved at the least the responsibility of forwarding by another line goods in its hands. It might have refused a shipment with such a responsibility attaching to it, if the goods had not been then in its hands, and it had the equal right to refuse to add such a responsibility to that which it had already assumed. We see no escape logically from this position, and it is, as we think, amply borne out by the authorities. People v. C. & A. R. R. Co., 55 Ill. 95-107; A. T. & S. F. R. R. Co. v. D. & N. O. R. R. Co., 110 U. S. 667-680; Central Stock Yards v. L. & N. R. R. Co., 192 U. S. 568; Coles, Simkins & Co. v. The Central Railroad & Banking Co. of Georgia, 86 Georgia, 251; Melbourne et al. v. L. & N. R. R. Co., 88 Alabama, 443; Hutchinson on Carriers, Third Edition, sec. 226.

As a matter of policy the Illinois Central Railroad Company in ordinary times would undoubtedly "strain a point," as the plaintiff put it, to forward the coal, but it could not legally be compelled to do it when it refused to do so and had given before notice that it would so refuse.

The judgment of the Municipal Court will be reversed and judgment entered here in favor of the Illinois Central Railroad Company against the Martin-Howe Coal Company for $14.59 and the costs of both courts.

*Reversed and judgment here.*