## The Chicago and Alton Railroad Company

### *v.*

### The People *ex rel.* Attorney General.

*Filed at Mt. Vernon October 22, 1894.*

1. MANDAMUS—*right to the writ must be clear.* A writ of *mandamus* will never be awarded where the right to it is doubtful, and not clear.

2. RAILROADS—*discretion in location of stations.* A very broad discretion is vested in railway companies in the matter of locating and maintaining freight and passenger stations.

3. SAME—*interests of majority consulted in locating stations.* It is not the duty of a railroad company to consult the interests and convenience of a minority, instead of that of a majority, in the location of its stations.

4. SAME—*village not necessarily entitled to station.* It is not a rule of law that because the line of a railroad passes through some portion of the territory of a village, a station must necessarily be established and maintained within the village.

5. SAME—*station provided beyond village limits.* If a railroad company makes reasonable provision for the accommodation of the people of a village by a station a short distance beyond the limits of the village, that will be sufficient.

6. SAME—*one station for two adjoining municipalities.* Where two municipalities adjoin, and one is substantially a suburb of the other, and a railway passes through a portion of each, it is not an invariable rule of law that a station must be maintained in each.

7. SAME—*cost of maintaining station exceeding profits.* A railroad company will not be compelled to locate a station at a point where the cost of maintaining the same will exceed the profits resulting therefrom.

8. SAME—*case of two lines between the same points.* Where a company operates two lines between the same points, and substantially performs its duty to the public by operating one for through and the other for local trains, without serious detriment to any considerable number of people and with more advantage to a greater number, it will not be compelled, by *mandamus*, to operate both lines for local trains.

APPEAL from the Circuit Court of Madison county; the Hon. B. R. BURROUGHS, Judge, presiding.

Messrs. WISE & DAVIS, for the appellant :

A writ of *mandamus* will be awarded only in cases where the party applying for it shows a clear right to have defendant do the thing which is sought to be compelled to be done. *People* v. *Glann,* 70 Ill. 234 ; *Lavalle* v. *Soucy,* 96 id. 467; *People* v. *Davis,* 93 id. 133 ; *People* v. *Johnson,* 100 id. 537; *People* v. *Klokke,* 92 id. 134 ; *People* v. *Comrs. of Highways,* 110 id. 577; *Dement* v. *Rokker,* 126 id. 174.

When the right is doubtful it will not be awarded. *People* v. *Dulaney,* 96 Ill. 503 ; *People* v. *Klokke,* 92 id. 134 ; *People* v. *Johnson,* 100 id. 543 ; *People* v. *Comrs. of Highways,* 118 id. 239 ; *People* v. *Railway Co.* 118 id. 113 ; *Swigert* v. *County of Hamilton,* 130 id. 538.

It will not be awarded where the defendant is required to exercise discretion in performing the act. High on Ex. Legal Rem. sec. 124 ; Tappan on Mandamus, 64, 280 ; *County of St. Clair* v. *People,* 85 Ill. 396 ; *School Inspectors* v. *People,* 20 id. 526 ; *People* v. *LaSalle County,* 84 id. 307.

The railroad company is vested with a broad discretion as to when and where it will build depots along the line of its road, and that discretion, in the absence of a charter or statutory regulation making it a specific duty, will not be interfered with by the courts, unless the facts show that the rights of the public have been clearly disregarded. *Railway Co.* v. *People*, 120 Ill. 200; *People* v. *Railroad Co.* 130 id. 182; *People* v. *Railway Co.* 31 Hun, 126; *People* v. *Railway Co.* 40 id. 570; *People* v. *Railway Co.* 103 N. Y. 95.

Mr. George Hunt, Attorney General, for the appellee:

It is the paramount duty of railway companies to establish and maintain their depots at such points and in such manner as to subserve the public necessities and convenience, and in recognition of this, contracts materially limiting their power to locate and re-locate their depots are held to be against public policy, and void. *Railroad Co.* v. *Mathers*, 71 Ill. 592, and 104 id. 257; *Bestor* v. *Wathen*, 60 id. 138; *Linder* v. *Carpenter*, 62 id. 309; *Railroad Co.* v. *Ryan*, 11 Kan. 602; *Railroad Co.* v. *Seely*, 45 Mo. 212; *Holladay* v. *Pattison*, 5 Ore. 177; Taylor on Corp. sec. 162; *People* v. *Railroad Co.* 130 Ill. 175.

Mr. Justice Baker delivered the opinion of the court:

This case was before us at a former term, and is reported as *People ex rel.* v. *Chicago and Alton Railroad Co.* 130 Ill. 175. The case was then submitted to us on a demurrer to the petition for a writ of *mandamus*. The substance of the prayer of the petition was, that a writ of *mandamus* should be issued commanding the railroad company to establish a passenger and freight depot in the town of Upper Alton, upon its line of railway between the station of Godfrey and the station of Wann, and to stop its trains, both freight and passenger, or a sufficient number thereof to accommodate the public, and discharge passengers and freight

thereat when requested. We there said : "The petition undertakes to show the public importance and necessity of the station asked for in two ways : First, by alleging the facts and circumstances which tend to prove it ; and secondly, by directly averring it. It cannot be doubted, we think, that the facts alleged make out a clear and strong case of public necessity. * * * Then, as we have already said, the petition directly avers, and the demurrer admits, that the accommodation of the public living in and near said town requires, and long has required, the establishment of a passenger and freight depot on the line of its road within said town. Unless, then, there is some explanation for the course pursued by the defendant which the record does not give, we cannot escape the conviction that its conduct in the premises exhibits an entire want of good faith in its efforts to perform its public functions as a common carrier, and an unwarrantable disregard of the public interests and necessities. It cannot be admitted that the discretion vested in the defendant in the matter of establishing and maintaining its freight and passenger stations extends so far as to justify such manifest and admitted disregard of its duties to the public." And the judgment of the circuit court was thereupon reversed for the error in sustaining the demurrer to the petition, and the cause was remanded for further proceedings. Upon the remandment of the case there was answer and replication, and a trial of the issues before the court, without a jury. The court found the issues for the petitioner and overruled a motion for a new trial. It then rendered final judgment, awarding a writ of *mandamus* against the railroad company, commanding it to establish and maintain a station on the line of its road at Upper Alton, and to stop at said station, daily, a sufficient number of trains to accommodate the public, and to receive and discharge at said station such freight and passengers as shall be there offered, in like manner as at other stations on the line of its road where like amount of freight and passengers was being

received and discharged by it at the time of the filing in the court of the petition herein. The record was then again brought here by appeal, and various assignments of error made.

We have examined the entire testimony in the record itself, and find the facts of the case to be substantially these : The Chicago and Alton Railroad Company owns and operates a line of railroad running from East St. Louis to Chicago. Alton is a city on the line of its railroad that is quite a manufacturing point and does a large business, and occupies the fourth place of importance in the freight and passenger traffic of the company. The company runs its passenger trains daily between St. Louis and Chicago, which pass through Alton, and also an accommodation train between Alton and St. Louis, making five trains daily, each way, on the company's road between Alton and St. Louis. The Indianapolis and St. Louis railroad (now the Cleveland, Cincinnati, Chicago and St. Louis Railroad Company, usually called the "Big Four,") runs into Alton. It also has an accommodation train running between Alton and St. Louis, and with its regular trains and its accommodation train has a number equal to those of the Chicago and Alton Railroad Company between those points, making ten trains daily on each road between Alton and St. Louis.

Upper Alton is a village whose territorial limits adjoin those of Alton on the east. It is principally a residence town, being practically an adjunct to Alton. It has a population of about 1700, including the students from abroad who attend Shurtleff College and the Wyman Institute, two educational establishments there. It has no manufactories, except a blacksmith shop, and wagon factory that uses no machinery but makes some wagons, no coal or lumber yards, no hotel, no bank and no large stores. It has some twelve or fifteen business houses, that do in the aggregate a business of about $100,000 or $125,000 a year, and of that amount one-third is bought by the mer-

chants from stores in Alton, the remainder mostly from St. Louis. It is connected with Alton by a steam motor line and a horse railroad. Both lines start at Upper Alton from the square, on which most of the stores are located, and run to within a block of the union depot at Alton, at which depot all trains on both railroads at Alton arrive and from which they depart. The motor line consumes about twenty minutes, and the street car line thirty minutes, making a trip between the places, and the distance between the points on each street railroad is about two and three-fourths miles.

In the extreme eastern limits of the city of Alton both the Chicago and Alton and the "Big Four" Railroad Companies have a station called "Stutz" or Upper Alton, at which most of their trains stop. It is on the line of the horse railroad running between Alton and Upper Alton, about one and one-third miles from the business part of Upper Alton, half a mile outside of its territorial limits, and it takes fifteen minutes to go on the street railroad from its business center to Stutz station. The travel from Upper Alton is from ninety to ninety-five per cent to St. Louis. This Stutz or Upper Alton station affords facilities to take, or depart from, any of the trains which leave this station daily for St. Louis and return thereto.

During the boating season on the Mississippi river, usually seven or eight months, a steamboat runs daily between Alton and St. Louis, leaving Alton at seven o'clock in the morning and returning at half-past five in the evening. The trip on the river being pleasant and cool, free from dust and much cheaper than by rail, causes the boat to be largely patronized by the people of Alton and Upper Alton. Freight by the boat is so much cheaper than by rail that during the river season seventy-five per cent of the merchandise that is bought in St. Louis for Upper Alton comes by way of the boat.

East of the territorial limits of Upper Alton, and a quarter of a mile east of the "cut-off" hereinafter men-

tioned, and about one mile from the business portion of the village, the Chicago, Burlington and Quincy Railroad Company has a depot for and called Upper Alton, but its passenger trains are very seldom patronized by the people of the village because they do not run at convenient hours, the trains leaving the depot for St. Louis at 6:00 A. M. and 4:30 P. M., and the train arriving there at 9:30 P. M., because they do not sell commutation tickets, and also because there is no street railroad to the depot. Consequently passengers from Upper Alton prefer to take the street railroad to Stutz station, in Alton, where they can have convenient trains, or take the motor line and go to Alton and take the boat. There are quite a number of residents in Upper Alton who are engaged in business in St. Louis, and who travel daily, both ways, between the village and St. Louis, and use commutation tickets.

The Chicago and Alton Railroad Company owns and operates a railroad called the St. Louis, Jacksonville and Chicago railroad, which runs from Godfrey, in Madison county, Ill., to Roodhouse, Ill., and from there west the Chicago and Alton Railroad Company has leased lines extending to Kansas City, Mo. The line of the Chicago and Alton railroad between St. Louis and Kansas City was about sixty miles longer than that of competing railroads, and in order to lessen the distance and make faster time, so as to compete with other lines, a systematic plan of work and improvement was adopted in straightening its line, cutting down the grades, filling up low places, and generally in shortening its line and making the road as level as possible, so as to enable freight locomotives to haul long and heavy trains, and passenger locomotives to pull large trains at such a rate of speed that connections could be made with outgoing trains at St. Louis and Kansas City, the great points desired. This plan has been pursued for years, and has cost the road about $8,000,000. In pursuance of and as part of this plan the so-called "cut-off" was built, which is an extension of the

St. Louis, Jacksonville and Chicago railroad from God-
frey to Wann, saving a distance of over two miles, and
reducing the grade from ninety feet to the mile by way
of Alton to thirty feet to the mile over the "cut-off." The
Kansas City trains, which formerly passed through Alton,
now go over the "cut-off." The "cut-off" is built through
the extreme north-eastern corner of the territorial limits
of Upper Alton, there being only two houses east of the
"cut-off" in the village. The distance from the business
block of Upper Alton to where it is desired the company
should build a depot on the Burton tract, on the line of
the "cut-off," is nearly two-thirds of a mile, and there is
no street railroad or other way of going to the depot, if
built, except to walk or go by private conveyance. There
are two Kansas City passenger trains over the "cut-off"
daily, one each way. One goes through Upper Alton to
St. Louis at 6:00 A. M., and the other goes through Up-
per Alton from St. Louis at 9:00 P. M. The Chicago,
Burlington and Quincy Railroad Company's depot is only
a short distance east from where the depot would be if
located on the Burton tract, and its passenger trains are
now, and have been for years, running at about the same
time that the Kansas City trains run, and have received
substantially no patronage from the Upper Alton people.
There is substantially no business between Upper Alton
and Godfrey, or north and west of there, and but little
travel, except that of theological students from the col-
lege, who more or less frequently go in that direction on
Saturday nights to preach on Sunday, and return on Mon-
day morning. In addition to the mercantile business,
some fruit, potatoes and vegetables are raised in and
near Upper Alton, the value of which, in good fruit years,
amounts to from $25,000 to $75,000. There is a good crop
of fruit once in two, three, four or five years. Some of
the fruits and vegetables are hauled to the freight depot
in Alton, a distance of three miles, and shipped from
there, some are shipped from the north at the junction,

which is about the same distance, and some are shipped from the depot of the Chicago, Burlington and Quincy Company. The Chicago and Alton Company also has a side-track at Stutz or Upper Alton station for loading and unloading freight.

The land that the company owns at Burton's was not acquired by condemnation proceedings, for freight and passenger depots, depot grounds and side-tracks, as alleged in the petition, but was purchased for $1000, and there is nothing in the deed tending to show that it was bought for the purposes above mentioned. The evidence shows that it would cost $3500 or $4000 to build a depot and side-tracks, and that $500 per year would be required to pay for the services of an agent. The evidence also shows that on account of the haul in wagons, the price of hard coal is twenty-five cents a ton higher in Upper Alton than in Alton, and soft coal a half cent a bushel higher. Trunks are not checked to or from Stutz or Upper Alton station, and if checks are desired they have to be checked to and from the union depot in Alton. The local express charge on a trunk between the latter depot and Upper Alton is twenty-five cents. The charge on a small package is ten cents, and it costs about one dollar a ton to have goods hauled by the load from the steamboat landing or railroad depots in Alton to Upper Alton. All telegraphic messages are subject to an additional charge for being transmitted by telephone to Upper Alton, and all express matter is subject to an extra charge for being transported from Alton. The fare on the horse railroad between Upper Alton and Upper Alton station, or between Upper Alton and the union depot in Alton, is five cents, and the fare on the motor line between Alton and Upper Alton is ten cents. And it also appears from the evidence that a person in Upper Alton who is desirous of going westward on the line of the St. Louis, Jacksonville and Chicago railroad is compelled to go to Alton, and there take a train on the Chicago and

Alton railroad to Godfrey, and there wait the arrival of the train on the St. Louis, Jacksonville and Chicago railroad, which, only a few moments before its arrival in Godfrey, had passed through the extreme eastern part of the territorial limits of Upper Alton ; and on returning, he must return by the same route, leaving at Godfrey the train which will in a few moments pass through the territorial limits of Upper Alton.

Our next concern is in regard to the law that is applicable to the facts of the case.

In *Ohio and Mississippi Railway Co.* v. *People ex rel.* 120 Ill. 200, this court, speaking of the railway company, said : "Nor is there any doubt of its duty to so operate it [the road] as to afford adequate facilities for the transaction of such business as may be offered it, or at least reasonably be expected. This is equally true with respect to passengers and freight. As to the extent or sufficiency of these facilities, including the number and frequency of trains, that is to be judged of and governed chiefly by the amount of business on the line of the road. The company, however, is given, as it should be, a very large discretion in determining all questions relating to the equipment and operation of its road,—hence courts, as a general rule, will not interfere with the management of railways in these respects, except where the act sought to be enforced is specific, and the right to its performance in the manner proposed is clear and undoubted." And in the same case it was further said : "It is believed, however, no case can be found which, in the absence of a statutory requirement, has gone to the length of holding that a railway company may be compelled, by *mandamus*, to increase the number of trains on its road or to run daily a particular number of trains over its road, and we are satisfied there is no common law authority for making such an order."

When this case was here before (*People ex rel.* v. *Chicago and Alton Railroad Co.* 130 Ill.175,) we used this language :

"It is undoubtedly the rule that railway companies, in the absence of statutory provisions limiting and restricting their powers, are vested with a very broad discretion in the matter of locating, constructing and operating their railways, and of locating and maintaining their freight and passenger stations. This discretion, however, is not absolute, but is subject to the condition that it must be exercised in good faith, and with a due regard to the necessities and convenience of the public. Railway companies, though private corporations, are engaged in a business in which the public have an interest, and in which such companies are public servants, and amenable as such."

In the late case of *Mobile and Ohio Railroad Co.* v. *People*, 132 Ill. 559, we said : "Railway stations for the receipt and discharge of passengers and freight are for the profit and convenience of both the company and the public. Their location at points most desirable for the convenience of travel and business is alike indispensable to the efficient operation of the road and the enjoyment of it as a highway by the public. Necessarily, therefore, the company can not be compelled, on the one hand, to locate stations at points where the cost of maintaining them will exceed the profits resulting therefrom to the company, nor allowed, on the other hand, to locate them so far apart as to practically deny to communities on the line of the road reasonable access to its use."

In the case of *People* v. *Rome, Watertown and Ogdensburgh Railroad Co.* 103 N. Y. 95, it was held by the Court of Appeals of the State of New York that where a railroad company, by consolidation, becomes the owner of two lines of road between the same points, and can substantially accommodate the people of the State by operating one of them, and can abandon the other without serious detriment to any considerable number of people, it will not be compelled, by *mandamus*, to operate both, where the operation of the line thus abandoned entails great expense without any return.

In the case at bar the People put in evidence a communication from T. B. Blackstone, president of the Chicago and Alton Railroad Company, addressed to the Board of Railroad and Warehouse Commissioners, in which he says : "The question of an additional station for Upper Alton has been many times carefully considered, at the request of the citizens of that town, and we have not been able to discover how it is possible to comply with their wishes without sacrificing the interest and conveniences of a much larger number of persons." This would seem to indicate that the officials of that road, in refusing to furnish the depot and service desired, were at least acting in good faith, and with what to them seemed to be a due regard for the necessities and convenience of the public. It appears to be certain that if the village is to be furnished with the additional passenger service insisted upon, that end must be accomplished by one of two means : Either the through passenger trains running between Kansas City and St. Louis must stop at the proposed new station, when established, for the purpose of taking on and discharging passengers, or else the company must run a special local train between such depot on the "cut-off" and St. Louis.

It appears from the testimony of Charles H. Chappell, general manager of the Chicago and Alton Railroad Company, as well as from that of Blackstone, that on account of its long line of road the company would not be able to compete with the Missouri Pacific and Wabash roads for the through passenger traffic between Kansas City and St. Louis if it was compelled to stop its through passenger trains at local points for passengers. This would be a very great hardship, in view of the large outlay of money the company has made in putting its line in shape for that branch of business, so as to make connections at St. Louis and Kansas City. Besides this, as the evidence shows, the main line and the Kansas City branch connect at Godfrey. Alton passengers going west are transferred from the Chicago to the Kansas City train, and the train to St. Louis

.from Kansas City, if on time, arrives at Godfrey almost half an hour earlier than the train from Chicago over the main line. The passengers for Alton leave the Kansas City train at Godfrey and wait for the Chicago train. If the Kansas City train is late and the Chicago train has gone by Godfrey, or if the Chicago train has met with an accident or been delayed so that it will reach Godfrey an hour or more late, in either case, to accommodate the Alton passengers and not let them remain at Godfrey, in the one case until noon, in the other until the Chicago train would arrive at Godfrey, the Kansas City train, instead of going over the "cut-off," goes through Alton, leaves the Alton passengers there, and proceeds to St. Louis. If the Kansas City trains were compelled to go over the "cut-off" to discharge and take on board passengers at a station on the "cut-off," they could not, in such instances, take the passengers to Alton, and thus the Alton travel, which is very much larger than the Upper Alton travel, would be incommoded for it. It is manifestly not the duty of the company to consult the interest and convenience of the minority instead of the interest and convenience of the majority of those desiring or requiring its services.

It was probably the considerations we have mentioned that induced the Board of Railroad and Warehouse Commissioners to write to president Blackstone the communication which is in evidence, wherein they say: "While through trains only are run on that branch of the railroad past Upper Alton, and the stoppage of such trains at that place would be injurious to the railroad, it is believed a light local train might be placed on that branch and stopped at that place without injury to the railroad company."

The freight trains that run over the "cut-off" are all through freight trains. The local freight trains all run through Alton. The uncontradicted evidence is that it would be impracticable for the company to run its through

freight lines and stop them to do any local work. The through fruits and vegetables could not be carried at all.

The question then arises, should the company be compelled to run a special train between the proposed station on the "cut-off" to St. Louis? The general manager of the railroad testifies: "There can be no comparison between the cost or expenses and the benefit or revenue received by the building of a depot, putting on a local train, and sending an engine daily after the freight at Upper Alton. If Upper Alton did a mercantile business of $125,000 and the fruit and vegetable business testified to in this case, and the company could get all of that business and the passenger business of Upper Alton by building a depot there and running a local train, as I have stated, it would not pay the company to do so. Take even Alton, which, say, is the fourth place of importance in the company's business along the line; if the company got Alton's entire business, I doubt if, for that business alone, we could afford to run more than one train a day. And the reason is, the business of a railroad is made up by a large number of places containing a little business, which enables us to get money enough to operate the whole." And Blackstone, in a letter addressed to the Board of Railroad and Warehouse Commissioners, put in evidence by the People, writes as follows: "We now understand it to be your wish that a local station shall be established on that road, and that persons and property shall be transported to and from it. We believe that the gross receipts which would be derived from such traffic would not be equal to one per cent of the cost of running even one special train per day to and from Upper Alton. If we are only approximately correct, we assume that you would not ask us to run such a train."

We find no evidence in the record which seriously militates against the conclusions reached by these two witnesses. If the station was established, the depot built and the local train put on the road, there is no assurance

that the persons who now ship their fruit and vegetables on the Chicago, Burlington and Quincy railroad would transfer their patronage to the appellant company. There is no assurance that the persons who now haul their fruits and vegetables to the freight depot in Alton and ship it to Chicago, would then haul their fruits and vegetables to the "cut-off" and ship them to St. Louis. That is not the market they are seeking to supply. There is no assurance that the merchants and traders who buy their supplies in St. Louis, and during two-thirds or three-fourths of the year have seventy-five per cent of them shipped by boat to Alton instead of by rail, because water transportation is cheaper than by rail, would not continue to so ship by boat. The evidence shows that a majority of the "commuters" and other residents of the village patronize the "Big Four" road instead of the Chicago and Alton road in going to and coming from St. Louis. There is no assurance that they would not continue to do so. Considerable portions of the village are nearer to Stutz or Upper Alton station than they are to the proposed new station. Would not those who live there continue to go to Stutz to catch a train for St. Louis? Would not those who live in or are about to start from the business center of the town prefer to take a street car and ride to Stutz station in fifteen minutes, to walking half a mile to the depot on the "cut-off?" And would not the great majority of passengers go to St. Louis by way of Stutz station, for the reason that quite a number of trains will leave there every day for St. Louis, both on appellant's road and on the "Big Four," whereas there would in no event be more than one or two opportunities each day of reaching St. Louis by taking a train at the proposed depot on the "cut-off?"

We do not understand it to be a rule of the law that a railroad company that constructs its line of road through any portion whatever of the territorial limits of a town or village is absolutely required, under any and all cir-

cumstances, to establish and maintain a station and depot on its line within the limits of such town or village. Nor do we understand there is any invariable rule of law that when two municipalities adjoin, and one is substantially a suburb of the other, and a railway passes through a portion of each, there must necessarily be a station and depot in each. In all probability there are localities within the corporate limits of the city of Alton that are almost or quite as far from any railroad depot as is the village of Upper Alton ; and it is in evidence here, that in the great city of Chicago the appellant company has but one freight depot, although its line runs for many miles within the city limits. In our opinion this record shows that appellant has made reasonable provision for the business accommodation of the people of Upper Alton by the station it has established and the side-track it has constructed at the place sometimes called Stutz and sometimes called Upper Alton station, even though that place is a short distance beyond the territorial limits of the village.

It seems to us that the issuance of a writ of *mandamus* herein would be violative of the rule that a very broad discretion is vested in railway companies in the matter of locating and maintaining freight and passenger stations; would be violative of the rule that without a statutory requirement such companies can not be compelled, by *mandamus*, to increase the number of trains on their roads; would be violative of the rule that such companies can not be compelled to locate stations at points where the cost of maintaining them will exceed the profits resulting therefrom to such companies ; would violate another rule which is deducible as a corollary from the rule announced in *People v. Rome, Watertown and Ogdensburgh Railroad Co. supra*, and which may be formulated thus : where a railroad company is the owner of two lines of road between the same points, and can substantially perform its duty to the people of the State by operating one of them exclusively for through trains and the other for local trains, without

serious detriment to any considerable number of people and with more advantage and convenience to a greater number of people, it will not be compelled, by *mandamus*, to operate both for local trains, where such operation of both will entail great loss and expense on the company without any return ; and would also be violative of the rule that everywhere obtains, that a *mandamus* will never be awarded where the right to it is doubtful, and not clear.

We think it was error to find the issues herein for the People, and error to award the peremptory writ of *mandamus*.     The judgment is reversed.

*Judgment reversed.*