# STATE ex rel. SKEEN v. OGDEN RAPID TRANSIT COMPANY.

## No. 2172. Decided November 25, 1910 (112 Pac. 120).

1. RAILROADS—DUTIES TO STOP TO RECEIVE AND DISCHARGE PASSEN-GERS—STATUTES. The duties imposed on carriers by Comp. Laws 1907, section 449, requiring every railroad to furnish sufficient accommodations for the transportation of persons and property at any station or stopping place established for receiving and discharging passengers and freight, must be discharged by a carrier at depots or stopping places duly established, and it does not require a carrier to stop its cars at any particular place to discharge or receive passengers. (Page 250.)

2. RAILROADS—DUTIES TO ESTABLISH STATIONS—POWER OF COURTS. The statutes do not confer on the courts power to determine whether a carrier should or should not establish and maintain a depot or stopping place for the reception and discharge of passengers or freight, or either, at any particular place or places along its line of road. (Page 250.)

3. MANDAMUS—PERFORMANCE OF COMMON-LAW DUTY. Where the common law imposes on a person a duty and the right of another to require performance thereof is clear and reasonably free from doubt, mandamus lies to compel such person to discharge that duty. (Page 251.)

4. RAILROADS—REGULATION—DEPOTS. The Legislature may, within limits, direct where a carrier shall maintain depots or stopping places for the convenience of the public, and it may require a carrier to stop its trains or some of them at such depots, or stopping places, or it may confer the power to determine whether a carrier shall do so on some board, and, in either case, the courts may coerce a defaulting carrier by mandamus to comply with the legislative edict or with an order of the board. (Page 251.)

5. RAILROADS—REGULATION—DEPOTS. Under ordinary circumstances, no inherent power is vested in the courts to control a carrier in its determination of the number of depots or stopping places that it will establish or maintain, or in the selection of the places where it will establish and maintain them along its line of railroad, but the matter is for legislative regulation. (Page 253.)

6. CARRIERS—REGULATION—DISCRIMINATION. The courts may prevent discrimination by a carrier. (Page 253.)

7. MANDAMUS—REGULATION—DISCRIMINATION. Where the duty of a carrier to receive a particular person at a particular place is clear, the courts may by mandamus compel the carrier to discharge the duty. (Page 253.)

8. COURTS—JURISDICTION. A court is an agency of the state by means of which justice is administered, and it may not exceed the powers vested in it for the sole reason that in its judgment it is necessary to exercise the power in the administration of justice.[1] (Page 254.)

9. CARRIERS—TRAIN SERVICE—DISCRIMINATION. The court in determining whether an interurban railway company is guilty of discrimination because it stops its cars to receive and discharge passengers at resorts along its line and refuses to do so at another resort may not consider the fact that it stops its cars at one resort, where such stop is by virtue of a special contract executed by it for a valuable consideration. (Page 255.)

10. RAILROADS—TRAIN SERVICE—DISCRIMINATION—STATUTES. Under Comp. Laws 1907, section 455, providing against discrimination from the same place under like conditions, and independent thereof, an interurban railway which stops its cars to receive and discharge passengers at resorts along its line of road and which refuses to do so at another resort is not guilty of discrimination, in the absence of evidence that any person stopped off at the former resorts simply because he could not do so at the latter resort, though the carrier refuses to stop at the latter resort merely out of ill will, and though there is no ground for its refusal to receive and discharge passengers there. (Page 255.)

11. RAILROADS—MANDAMUS—DISCRIMINATION—REMEDY. Where a carrier refuses permission to one person to enter or alight from its cars at a place where under similar circumstances it extends the privilege to others, the carrier is guilty of discrimination against the former, and the court may by mandamus prevent it. (Page 257.)

APPEAL from the District Court, Second District; *Hon. J. A. Howell,* Judge.

Mandamus by the State, on relation of J. D. Skeen against the Ogden Rapid Transit Company.

Judgment for plaintiff. Defendant appeals.

---

[1] Larson v. Salt Lake City, 34 Utah, 318, 97 Pac. 483, 23 L. R. A. (N. S.) 462.

REVERSED AND REMANDED.

*Richards & Boyd* for appellant.

*J. D. Skeen* for respondent.

FRICK, J.

On the 27th day of June, 1910, the plaintiff applied to the district court of Weber County, Utah, for a writ of mandate to require the defendant, as a common carrier of passengers, to stop its cars at a certain place named in the application for the purpose of permitting the plaintiff and others to enter upon said cars as passengers and to alight therefrom at the place stated. The district court, after a hearing, issued a peremptory writ in which the prayer of the plaintiff was granted, and the defendant now presents the record of the proceedings in due form to this court for review on appeal.

A careful reading of the entire record, including all of the evidence adduced at the hearing, discloses substantially the following facts concerning which there is practically no dispute:

The defendant is a corporation organized as a common carrier of passengers, and owns and operates a certain line of street and interurban railway. The line of railway is operated, as aforesaid, for a distance of about seven miles between the Ogden Union Depot and what is known as the "Hermitage" located in Ogden Canyon, in Weber County, Utah. At the mouth of Ogden Canyon is located what is known as the Ogden Canyon Sanitarium, which is a public summer resort. A hotel for the accommodation of patrons, saloon, dance hall, and other places of amusement, are maintained there for the pleasure and amusement of the public generally. The sanitarium is located immediately east of the corporate limits of Ogden City, and west of that point defendant's railway is operated as a street railway while east thereof—that is, within the Ogden Canyon proper—the road is operated as an interurban line. Some distance east of the

sanitarium, and within Ogden Canyon, there is what is known as the "Peery Resort," where a few people temporarily live during the summer season. About three-quarters of a mile further east, and up the canyon, is what is known as the "Lewis Resort," which is located on lands owned by J. S. and Eva Lewis, and to which we shall further refer hereafter. Farther up the canyon still is what is known as the "Hermitage," which is the eastern terminus of defendant's line of railway. The Hermitage, like the Ogden Canyon Sanitarium, is a public resort with hotel and other conveniences, dancing pavilion, boating pond, and other attractions similar to those at the sanitarium aforesaid. The Ogden River, a considerable stream of water, flows through Ogden Canyon. The canyon is therefore a desirable place for camping, and for many years has been used by many citizens as a temporary place of residence during the summer or heated months of the year. While the canyon proper at many places is too narrow, and the sides thereof too precipitous, to be used for the purposes of either public or private resorts, yet there are numerous places where the canyon widens out somewhat, and at some of such places public resorts have been established, while at other points resorts for summer residence have been maintained as aforesaid. A good road for all kinds of ordinary vehicles has been constructed and is maintained in the canyon.

It appears that prior to 1909 the line of railway terminated at the sanitarium, but that in that year the road was extended into the canyon to the Hermitage as before stated. In extending the line the road passed through the Peery resort before mentioned, and also through said Lewis resort. In consideration of being granted a right of way through the lands owned by the Peerys the defendant entered into a contract whereby it agreed to stop its cars at that point when requested to do so by any person who desired to enter on or to alight from its cars there. Pursuant to this agreement the defendant has stopped and continues to stop its cars on request at said point. When the land owned by Lewis was reached, the defendant was refused permission to construct

its road thereon, and it was compelled to condemn a right of way through the same, and a strip of land one rod in width and a little over two thousand feet in length was accordingly condemned through said lands for a right of way. In the center of said tract defendant laid its track, which is standard guage, namely, four feet, eight and one-half inches between rails, while the cars are about eight feet, ten inches wide, projecting somewhat over each rail. While the Lewises own quite a large tract of land in and along each side of the canyon, the amount that is fit for summer residence is merely an oblong strip embracing between four and five acres of ground through which defendant's line of railway is constructed and operated. When the line of railway was constructed in the summer of 1909, the defendant requested, and was given permission by Mr. Lewis to stop its cars at a certain private road crossing on the strip of land used for summer residences as aforesaid. What is called the Lewis resort is purely private—that is, a small parcel of ground is leased to any one who desires to pitch a tent on the strip, or Mr. Lewis, with the land, also furnishes the tent or summer cottage to any one desirous of renting an abode during the summer months. Mr. Lewis testified that about nine-tenths of all the tenants rent the tent or house from him, while the remainder provide their own tents or summerhouses. Either the parcel of land to live on, or the tent or house, is rented for the summer season commencing some time in June and ending some time in September of each year, and each tenant is given the privilege of taking the same place the following summer if he so desires. The business has been conducted as aforesaid at the so-called Lewis resort for quite a number of years, and the number of those who have rented summer residences or places there has increased somewhat each year. This year there were about one hundred persons, children and adults, exclusive of the Lewis household, living at the resort.

In June of this year plaintiff rented a summer residence from Lewis, and in that month moved into it with his family. On the 27th day of April, and before the summer season

opened in Ogden Canyon, the defendant posted notices in its cars that after that date it would not stop any of its cars at any point in the canyon "between Peery's and the Hermitage." The defendant also prepared a schedule for the running of its cars between said Ogden Union Depot and the Hermitage, and at the time of plaintiff's demand was operating them in accordance with said schedule. According to this schedule, west of the sanitarium, and within the Ogden city limits, the cars are stopped at regular intervals, and at such places signs are placed on the overhead wires which read: "Cars stop here." In this connection the evidence shows that one of the motormen, perhaps some others, upon request, has stopped and permitted some persons to enter the car at points other than where the signs are put up, but it also appears that to do this was contrary to the orders of defendant, and occurred only on rare occasions. It also is made to appear that during the period of time that the road was being constructed in the summer of 1909 in Ogden Canyon the defendant's motorman also frequently permitted persons to either get on or alight from the cars at the Lewis resort, or at the upper end thereof at the point where the defendant at that time maintained a switch, but which has since been removed. There is no evidence, however, that the defendant stopped its cars for the purpose of permitting any person either to enter on or to alight from them at any point in the canyon except at the sanitarium, Peery's, and the Hermitage after the 27th day of April, 1910. On the contrary, the evidence is all to the effect that within the canyon the cars were stopped only at those three points. On the 16th day of June, 1910, plaintiff demanded from the defendant that it stop its cars at the Lewis resort for the purpose of receiving him as a passenger on one of its cars, and on the same day, while he was returning on one of defendant's cars as a passenger from Ogden City to said Lewis resort to his family, plaintiff timely demanded from defendant's conductor in charge of the car that said car be stopped at the Lewis resort for the purpose of permitting plaintiff to alight therefrom. The defendant, through its conductor, refused,

and continues to refuse the request of the plaintiff, and refuses to stop its cars or any of them at said Lewis resort, and refuses to receive the plaintiff or any one else at that point as a passenger, and also refuses to stop its cars or any of them to permit the plaintiff or any other passenger to alight therefrom at said point. The evidence also shows that at least a number of those who have rented summer residences at the Lewis resort carry on or conduct some business in the city of Ogden and are desirous of passing daily over its line between said resort and Ogden City, and that many of them, including the plaintiff, are considerably inconvenienced by defendant's refusal to stop its cars at the Lewis resort because they must either stop off at the Peery resort and walk three-quarters of a mile east on the defendant's track to reach their summer home at the Lewis resort, or must pass through that place and go to the Hermitage one mile beyond, and then walk down the track for that distance to reach their summer home.

Mr. Lewis also testified that the permission to stop the cars which he gave the defendant in 1909 has never been withdrawn, but further says that he never granted, and that the defendant has not obtained, any other facilities to stop its cars on his land except the one-rod strip which was condemned, and that there are no public roads or highways which enter the resort located on his land. He also says that the resort is purely private, and no one can locate on the land without his permission and without paying rent, and that all ingress and egress to and from the same is shut off between the months of October of one year and June of the following year. It is also made to appear that defendant's cars can be stopped with the same facility at the Lewis resort that they can be at any of the other resorts, and that defendant does stop its cars at at least one place where it has no better facilities to stop them than it has at the Lewis resort.

It is also contended, and the court so found, that the reason for refusing to stop the cars at the Lewis resort is "entirely because of ill will and malice growing out of certain condemnation proceedings instituted against John S.

Lewis by the said defendant." This finding is, however, assailed by the defendant upon the ground that it is not supported by the evidence. The only evidence to support it is the testimony of the plaintiff, who, in answer to a question propounded to him while a witness in his own behalf as to whether he did not know that the defendant would not stop its cars at the Lewis resort before he went there in June, 1910, testified: "Well, Matt. Browning told me that they were going to get even with Mr. Lewis on that proposition, and I rather supposed it was of a temporary nature." By this the witness meant that the refusal to stop cars at the Lewis resort would be merely temporary. When, and under what circumstances, the statement was made, and what, if any, relation Matt. Browning sustained to the defendant at the time it was made, is not disclosed. The finding in our judgment is not supported by any evidence. But, in view of all the circumstances, the finding is without controlling force, as will more fully appear hereafter.

We have been thus explicit in stating the facts for the reason that the case is one of first impression in this state, and because no claim is made that the defendant either in its charter or by contract has assumed the duty of stopping its cars at the Lewis resort. The plaintiff, however, contends that the duty to stop its cars is imposed upon the defendant either by the common law which is in force in this state, or by section 449, Comp. Laws 1907, which reads as follows:

"Every railroad company shall furnish sufficient accommodations for the transportation of all persons and property as shall, within a reasonable time previous to the departure of any train, offer or to be offered for transportation at any station, siding or stopping place established for receiving and discharging passengers and freight, and at any railroad junction; and shall take, transport, and discharge such passengers and property at, from, and to such places, on the due payment of tolls, freight, or fare therefor; and if the company or its agents shall refuse to take and transport any passenger or property, or to deliver the same at the regularly appointed places, it shall be liable to the party aggrieved for all accruing damages, including costs of suit."

Upon the other hnd, the defendant insists that no such duty is imposed by either the common law or by the provisions of the foregoing section, and further contends that no authority is vested in the courts of this state to require the defendant to establish a depot or stopping place, or to stop its cars, at any particular point along its line of railroad for the purpose of receiving or discharging either freight or passengers, and that, therefore, the district court has exceeded its powers in issuing the peremptory writ of mandate.

A mere cursory reading of the foregoing section discloses that it contains nothing from which the court can deduce a legislative command that a common carrier must establish and maintain depots or stopping places at any particular place or places along its line of road. The duties imposed by that section are to be discharged by the common carrier at depots or stopping places which have been duly established, and what is there said had no reference to the establishment of depots or stopping places, or to the stopping of trains or cars, where there are no regularly established depots or stopping places. The defendant, therefore, was not required to stop its cars at the Lewis resort by reason of the provisions of section 449, *supra*. Nor is there anything in that section or in any other to which our attention has been directed or that we can find which confers upon any of the courts of this state the right or power to determine whether a common carrier should or should not establish and maintain a depot or stopping place for the receipt and discharge of passengers or freight or either at any particular place or places along its line of railroad. There was therefore neither a contractual nor a statutory duty imposed on the defendant to stop its cars at the Lewis resort.

The next inquiry, therefore, is: Does the common law impose the duty upon a common carrier to establish and maintain depots or stopping places along its line of railroad for the accommodation and convenience of individuals or communities at points other than such as the carrier in its judgment

deems necessary and proper in the conduct of its business? If the common law imposes such a duty upon the defendant in this case, and the right of the plaintiff to require the defendant to comply with it is clear and reasonably free from doubt, then the power of the district court to coerce the defendant by mandamus to discharge that duty is likewise beyond question. It is now well settled that the legislature of any state may within certain limitations determine and direct at what places a common carrier shall establish and maintain depots or stopping places for the convenience of the public, and that it may require the carrier to stop its trains or cars, or some of them, at such depots or stopping places, and that the legislature, within what are now well-defined limits, may confer the power to determine whether the carrier shall do so or not upon some board or tribunal. In either case the courts have the power to coerce a defaulting carrier by mandamus to comply with the legislative edict, or with the order of such board or tribunal. 33 Cyc. 43, 44. Upon the question whether the courts may inquire into and determine the necessity for establishing a depot at a certain place, and, if it be found by the court that the necessity for one exists, in the absence of statutory authority to do so, may order a carrier to establish such a depot or stopping place for the receipt and discharge of freight and passengers, the courts are not unanimous. A careful analysis of the cases will show that, while a number of cases are usually cited in support of the doctrine that the courts possess inherent power to control the carrier in the establishment of depots or stopping places, yet there is in fact but one case that really goes to that extent, namely, the case of *State v. Republican Valley Ry. Co.*, 17 Neb. 647, 24 N. W. 329, 52 Am. Rep. 424. The cases upon the subject are nearly all collated by Mr. Elliott in notes to section 662 in volume 2 of the second edition of his excellent work on Railroads. The decisions in all of the cases, except the one from Nebraska, are in fact based upon particular statutes. There are quite a number of courts, however, who have given the subject careful con-

sideration, and, after doing so have arrived at the conclusion that under ordinary circumstances no inherent power is vested in the courts of his country to control a common carrier in its determination of the number of depots or stopping places that it will establish and maintain or in the selection of the places where it will establish and maintain them along its line of railroad. Among the well-considered cases in which the question is passed on are the following: *Nashville, etc., Ry. Co. v. State,* 137 Ala. 439, 34 South. 401; *Northern Pac. Ry. Co. v. Washington ex rel. Dustin,* 142 U. S. 492, 12 Sup. Ct. 283, 35 L. Ed. 1092; *State ex rel. Smart v. Kansas City, etc., Ry. Co.,* 51 La. Ann. 200, 25 South. 126; *People ex rel. Linton v. Brooklyn, etc., Co.,* 172 N. Y. 90, 64 N. E. 788; *People v. N. Y. L. E. & W. Ry.,* 104 N. Y. 58, 9 N. E. 856, 58 Am. Rep. 484; *State ex rel. Atty.-Gen. v. Southern, etc., Co.,* 18 Minn. 40 (Gil. 21); *Chicago, etc,, Ry. Co. v. People ex rel. Atty.-Gen.,* 152 Ill. 230, 38 N. E. 562, 26 L. R. A. 224; *Honolulu Rapid Trans., etc., Co. v. Hawaii Terr.,* 211 U. S. 282, 29 Sup. Ct. 55, 53 L. Ed. 186; *Atchison, Topeka & S. F. Ry. v. Denver, etc., Ry. Co.,* 110 U. S. 667, 4 Sup. Ct. 185, 28 L. Ed. 291.

In *Northern Pac. Ry. Co. v. Washington ex rel. Dustin, supra,* Mr. Justice GRAY, after discussing at some length the lack of the power of the courts in this regard, at page 500, says:

"To hold that the directors of this corporation, in determining the number, place and size of its stations and other structures, having regard for the public convenience as well as its own pecuniary interests, can be controlled by the courts by writ of mandamus, would be inconsistent with many decisions of high authority in analogous cases."

In support of this doctrine both American and English cases are cited. The case of *State v. Republican Valley Ry. Co., supra,* is referred to by Mr. Justice GRAY, but it is disapproved. It is true that in the *Northern Pac. Ry. Co. Case, supra,* there is a dissenting opinion concurred in by two of

tne justices, but a careful perusal of the dissenting opinion discloses the fact that the dissenting justices merely assumed the power to be vested in the courts without inquiring from what source such a power is derived. In all of the cases which we have cited above, the facts and circumstances were much stronger than they are in the case at bar, but, notwithstanding this, the appellate courts all promulgated the doctrine that the power to control a common carrier with respect to proper depots or stopping places for its trains or cars for the convenience of the public is inherent in the legislative, and not the judicial, department.

When the legislature has declared when and under what conditions and circumstances depots and stopping places shall be established and maintained, the courts may be mandamus compel the carrier to comply with the conditions imposed by the legislature, but the courts have no inherent power to determine for themselves when, where, and under what conditions and circumstances a common carrier shall establish and maintain a depot or stopping place for the convenience of the public, or to stop its trains or cars at a particular place either to receive or discharge a passenger or passengers. It is true that courts may prevent discrimination, and, where the duty to receive a particular person at a particular place is clear, the courts may, by writ of mandate, compel the carrier to discharge such duty.

From the record it is made to appear that the district court in issuing the writ of mandate in this case was impelled to do so for the following reasons, which we give in his own words: "It seems to me that inasmuch as the court cannot find any other valid reason for the failure of this company to perform its duty to the public at this particular resort, and inasmuch as the uncontradicted testimony in this case shows that it is a matter of spite against Mr. Lewis on account of the proceedings that were had in this court as it has been shown by the statement which Mr. Browning made as testified to by Mr. Skeen, which is uncontradicted by Mr. Browning, this court should let its mandate issue."

The court then proceeds to state that under the decisions of
the Supreme Court of the United States there is some doubt
of the power of the court to compel the defendant to comply
with plaintiff's demands, but notwithstanding such doubt the
court grants the writ for the reason, as appears from his
own statement, that "this court should not consider itself
absolutely helpless to remedy this obvious discrimination on
the part of this carrier; and, if it is helpless, some other
court will have to decide that it is so." Courts no doubt
are often tempted to, and do, interfere where in their judg-
ment justice demands interference, although there may be
some doubt with respect to their power. It should be re-
membered, however, that courts are merely the agen-
cies of the sovereign state by means of which the sov-
ereign administers justice, not according to the no-
tions of the judges, but in accordance with fixed rules and
forms of law. A court may in its judgment deem the exer-
cise of a certain power necessary in order to administer
full and complete justice in a particular case, yet unless the
power to be exercised is one of the inherent powers of the
court, or is conferred upon it by the lawmaking power, the
court would be guilty of usurpation if it exercised the power,
although to do so might reflect justice in that particular
case. The doctrine that courts may not exceed the powers
vested in them, for the sole reason that in their judgment
the exercise of such a power is necessary in the administra-
tion of justice is clearly stated and illustrated by Mr. Jus-
tice Straup in the case of *Larson v. Salt Lake City,* 34 Utah
318, 97 Pac. 483, 23 L. R. A. (N. S.) 462. In that case
the district court exercised what in our judgment constituted
a legislative power which the legislature had not authorized
the court to exercise, and for that reason, and for no other,
the judgment of the lower court was reversed by us. In
our judgment the same principle is involved here. The
power that the district court exercised in this case is under
the great weight of authority clearly legislative, and not judi-
dicial, and, unless and until the legislature confers the right
upon the courts to exercise such a power, they cannot legally

exercise it, although to do so would reflect justice in a particular case. It is true that the district court seem to be impressed with the thought that this was a case of discrimination, and that the court, as he expressed it, was not "helpless to remedy this obvious discrimination." By this the court meant that because the defendant stopped its cars at the sanitarium, at Peery's, and at the Hermitage, and did not do so at the Lewis resort, therefore the defendant discriminated against the Lewis resort and in favor of the other resorts. That this so-called discrimination was not in favor of the other resorts is too obvious to require argument. The evidence is conclusive that no person stopped off at any of the other resorts simply because he could not stop off at the Lewis resort. Moreover, the Lewis resort is a place where certain persons stopped off only because they had a temporary abiding place there, and not because they sought after amusement or entertainment, as was the case at the sanitarium and at the Hermitage. The only discrimination, therefore, that could possibly exist would be one against the Lewis resort, which would have to be based on the mere fact that the cars of the defendant refused to stop at that place while they stopped at the other resorts. The so-called Peery resort cannot be taken into consideration, since the cars stopped there by virtue of a special contract and for a consideration received by the defendant. It is manifest, therefore, that the district court in truth and in fact merely directed the defendant how to conduct its business under particular circumstances under the guise of preventing discrimination. If a common carrier by stopping its trains or cars at one village or settlement and by refusing to do so at another village or settlement through which its trains and cars pass and where the cars can be stopped is guilty of legal discrimination against the latter village, then it follows that a common carrier must stop its trains or cars, or some of them, at every village or settlement through which it passes if requested to do so by the inhabitants or some of them, or it will be guilty of discrimination. In the absence of a statute requiring the carrier to do so, it

ordinarily at least commits no breach of duty in failing or re-
fusing to stop its cars at one village, although it does so at
another similarly situated. Nor was the defendant guilty
of discrimination against the plaintiff or others who, like
him are staying at the Lewis resort. Our statute (section
455, Comp. Laws, 1907), which is declaratory of the com-
mon law, simply provides against discrimination "from the
same place, under like conditions, under similar circum-
stances and for the same period of time." Nor is the fact
that there is no good reason why the defendant does not
stop its cars at the Lewis resort, or that it refuses to do so
because of ill will of one or more of its managing officers,
a matter of controlling importance. Where the power to
examine into the question whether the carrier should stop
its trains or cars at certain places under certain conditions
and circumstances is conferred either upon a court or some
other body or tribunal, it may easily become material if not
a controlling factor in the case that the carrier refuses to
stop its trains or cars at a particular place out of mere ill
will. Where, however, as in this case, the court is powerless
to compel the carrier to stop its cars at a particular place,
it is, to say the least, immaterial upon what ground the re-
fusal to stop is based. We have no hesitancy in saying that,
if the matter were left to our judgment or discretion, we
would be compelled to hold that under the undisputed facts
and circumstances of this case defendant's refusal to stop
some of its cars, at least mornings and evenings, at the Lewis
resort, is wholly inexcusable, if not entirely arbitrary. This,
however, is a matter to be regulated by the legislature, and
not by the courts.

Where the legitimate power of the court ends and it never-
theless acts, the act is usurpation pure and simple, and any
attempt to justify the act upon the ground that in the opin-
ion of the court justice demands the act cannot rescue the
act from constituting usurpation, nor does it palliate the
offense. If the defendant had refused plaintiff permission
either to enter upon its cars or to alight therefrom at the

Lewis resort, while, under similar circumstances, it extended the privilege to enter and to alight from its cars to others at that place, it would be a clear case of discrimination against the plaintiff. It would likewise constitute a refusal upon the part of the defendant to discharge a plain legal duty it owed to him. Under such circumstances, the court could require the defendant to discharge its duty by a writ of mandate. But, as we have seen, we are not dealing with such a case, but are dealing with a case where the defendant at a particular place treats all alike who live or are at that place, but does not treat them the same as it does others who live or are at some other places which are surrounded by somewhat different conditions and circumstances. To compel the defendant to treat all of the settlements or communities along its line of railroad alike is, as we have shown, a matter for legislative, and not for judicial, regulation.

We do not wish to be understood as holding that conditions and circumstances may not arise under which a court, even in the absence of a statute, would not be authorized to interfere as against the arbitrary acts of a common carrier in failing to provide facilities and conveniences for the public. When and under what conditions the courts might have power to interfere upon equitable or other grounds is not before us, and upon that question we express no opinion. All that we decide at this time is that, under the undisputed facts and circumstances of this case, the district court was not justified in issuing the writ.

The judgment is therefore reversed and the cause remanded to the district court, with directions to dismiss the proceedings. Appellant to recover costs.

STRAUP, C. J., and McCARTY, J., concur.