# CIRCUIT COURT NO. 2 OF BALTIMORE CITY.

Filed March 26, 1913.

NORTHERN CENTRAL RAILWAY, ET AL.,
VS.
PHILIP D. LAIRD, ET AL.

*Shirley Carter* for Northern Central Railway Company.

*Wm. Ainsworth Parker, W. Irvine Cross* for Baltimore and Ohio Railroad Company.

*Wm. Cabell Bruce, John B. Daisch* for Public Service Commission.

DUFFY, J.—

In 1911 several commercial exchanges in Baltimore City instituted one proceeding before the Public Service Commission, and another before the Interstate Commerce Commission, against the railroads which had terminals in Baltimore City. The object of the two proceedings was the same. It was to obtain a reduction of the high rates which were then prevailing for transporting cars from the terminals or tracks of one railroad to the terminals or tracks of some other road within the city. Such transportation is called switching, and the rates are called switching charges. The proceeding before the Interstate Commerce Commission culminated May 14, 1912, in a direction to the railroads to establish within thirty days joint rates for the interchange of interstate traffic, and the maximum rates which the railroads were permitted to charge for this service were set forth.

In the proceeding before the Public Service Commission testimony was taken and on May 31, 1912, an order was passed. By this order a switching district was established which contains the City of Baltimore and a little territory outside of the city limits unimportant in amount. The order further provided certain flat per car rates for moving cars within the district which are substantial reductions from the rates established for the same service by the roads.

The two proceedings at bar were instituted by the Baltimore and Ohio Railroad, the Baltimore Belt Railroad and the Pennsylvania Lines against the Public Service Commission to enjoin the enforcement of this order.

Much testimony was taken by the Complainants and the Commission then offered in support of its action in passing the order, the testimony taken before it, with certain exhibits then filed, together with the stenographic notes of a "Conference" had between the Commission and the representatives of the railroads. Exception was taken by the complainants to the admission of this evidence. This will be first considered.

Examination of the Public Service Commission Act discloses that Section 10 provides that in all hearings the Commission shall not be bound by the technical rules of evidence. "Technical Rules" here refers to rules as to admissibility, such as the hearsay evidence rule and the rule as to authenticating documents, records and accounts. It has no reference to the "essential rules of evidence by which rights are asserted or defended." "All parties must be fully apprised of the evidence submitted or to be considered, and must be given opportunity to cross-examine witnesses, to inspect documents, and to offer evidence in explanation or rebuttal. In no other way can a party maintain its rights or make its defense. In no other way can it test the sufficiency of the facts to support the finding."

I. C. C. vs. L. & N. R. R., 227 U. S.

Section 43 provides that any corporation being dissatisfied with an order of the Commission fixing a rate may commence an action in the appropriate court against the Commission, as defendant, to vacate the order on the ground that the rule is unlawful or unreasonable.

Section 44 provides that if upon trial of such action evidence shall be introduced by the plaintiff which is found by the Court to be *different from* or *additional* to that offered upon the hearing before the Commission, the Court before rendering judgment shall transmit a copy of such evidence to the Commission, in order that it may rescind or alter its order. If it alters the order it shall report its action to the Court, and that then the Court shall render judgment on the order as originally framed or as so altered, as the case may be. While the Act nowhere provides that the Court shall have before it the testimony taken before the Commission, the above mentioned provision of Section 44 clearly shows that such is contemplated. For how can the Court tell whether the testimony offered by the plaintiff, the aggrieved corporation, is different from

or additional to the testimony offered before the Commission without having the latter before it?

Section 47 provides that in all actions in Court arising under this Act, the practice and rules of evidence shall be the same as in civil actions, except as herein otherwise provided.

The phrase "except as herein otherwise provided" means nothing if it does not refer to the provisions of Section 10, that in hearings before the Commission "Technical Rules" of evidence shall not be observed. For these are the only two provisions of the Act in which the rules of evidence are mentioned. And this phrase still means nothing, if the testimony taken before the Commission, without observing the rules of evidence, is not before the Court, in which the taking of testimony, by Section 47, the rules of evidence must be observed.

But there are other reasons why the testimony taken before the Commission must be before the Court. The Court's function is not legislative, it has no power to reform or remake or modify the rate made by the Commission. It must sustain the order of the Commission or vacate it. The Court will vacate the order, if, among other reasons, the Court finds that there was no evidence before the Commission to support it or that the evidence was inconclusive. But it will not pass on the weight of conflicting testimony, or substitute its own opinion for that of the Commission on questions of fact or as to which party's testimony preponderates.

136 Wis. 164.

I. C. C. vs. L. & N. R. R., 227 U. S.

I. C. C. vs. U. P. R. R., 222 U. S. 547.

Again it would be an anomalous condition if the Commission by the Statute can take testimony without observing the technical rules of evidence, and the Court when called upon to vacate the Commission's finding must confine itself to testimony taken before it and taken according to the rules of evidence. This would result in making the findings of the Commission nugatory, if resort is had to the Court, in every case in which the Commission relied on hearsay evidence and documents which cannot be authenticated in a Court. Furthermore, there can be no doubt that the plaintiff can

found this bill on the fact that the evidence before the Commission utterly failed to show that the switching rates now and heretofore in operation were unreasonable. In order to make out such a case the plaintiff *must* introduce in this case the evidence which now the defendant is offering. This was the plan of attack adopted by the complaining carrier in the L. & N. case, apparently without objection. It was not there offered as an admission against the Commission, but obviously to enable the Court to see what the Commission did.

I therefore conclude that the meaning of Section 44 is the same that it would be if it contained plain provision for offering in evidence in the Court proceeding, the testimony taken before the Commission.

For these reasons the exceptions filed by the complainants to the admissibility of the evidence offered by the Commission will be overruled.

The difficulty out of which this controversy grows will be made plain by an example. The rate on brick from Frederick to Camden Station by the Baltimore and Ohio Railroad is sixty-five cents per ton. From the same point by Pennsylvania Lines to Calvert Station is one dollar per ton, because of the greater distance. The joint rate on brick from Frederick to Baltimore by Baltimore and Ohio to Bay View Junction, and then by the Pennsylvania Lines to Calvert Station, is eighty-five cents per ton; but if the brick are consigned by Baltimore and Ohio to Camden Station, and must for any reason be shifted to Calvert Station, the charge between the two stations via Bay View Junction, the switching point, is one dollar per ton. It will thus be seen that it costs as much to switch these brick from Camden Station to Calvert Station, as it does to transport them from Frederick to Calvert Station by the Pennsylvania Lines. And if the brick are billed from Frederick by Baltimore and Ohio to Camden Station, and then from there to Calvert Station, it will cost one dollar and sixty-five cents, or eighty cents more per ton than if they come by Baltimore and Ohio to Calvert Station by the joint rate.

Record, pp. 97, 98, 99, 108, 109.

The rate for this haul for a twenty-ton car will be thirteen dollars to

Camden and seventeen dollars to Calvert by Baltimore and Ohio. On a forty-ton car the rate will be twenty-six dollars to Camden, and thirty-four dollars to Calvert by Baltimore and Ohio. On a sixty-ton car the rate will be thirty-nine dollars to Camden and fifty-one dollars to Calvert by Baltimore and Ohio. It will thus be seen that the shipper by use of the flat rate to Camden plus the commission's switching rate of six dollars on a twenty-ton car would lose two dollars, and on a forty-ton car he would gain two dollars, and on a sixty-ton car he would gain six dollars over the joint rate. But with the establishment of joint rates the switching difficulty is diminished. With a joint rate that is reasonable there may be no public need for a switching rate, and this seems to be the view the Interstate Commerce Commission took of the branch of this controversy it decided, for it treated it as a joint rate question.

The method of dividing the joint rate agreed upon by the Baltimore and Ohio and the Pennsylvania Lines indicates the value they place on their terminals much better than the testimony of experts can show it. It is stated by Mr. Lewis on Page 359, et seq.: "The joint rate from Buffalo to Baltimore—Pennsylvania to Bay View and from that point to Camden by B. & O., is fifteen cents per 100 pounds—$90 for a thirty-ton car. Out of this sum the Baltimore and Ohio gets one and one-half cents per one hundred pounds for use of its terminals, and of the balance Baltimore and Ohio gets twenty per centum to the Northern Central's eighty per cent. This makes $25.20 for the car to Baltimore and Ohio. If the order of the Commission goes into effect for this car the Baltimore and Ohio will get but three dollars (pp. 34-37, 50, 65) for obviously the Pennsylvania would be unwilling to ship this car by the joint rate. It will thus be seen that to put this switching charge into operation will cause joint rates to be abrogated, to some extent at least.

The order of the Interstate Commerce Commission in the part of this litigation before it requires joint rates to be made and put into operation, as to interstate commerce, and I understand that this has been done by the roads.

The Maryland Commission has taken no action as to intrastate joint rates, but it was announced during the trial that such rates had been put into operation by some of the roads, and would shortly be put into operation by all the roads touching Baltimore. By Sections 13, 15 and 18 of the Act, the Commission has full jurisdiction and control over these joint rates. It can compel the roads to establish them where they do not exist, and regulate them when they are established. I wish to point out here that this method of affording relief is open and was evidently considered by the Legislature as the most practicable, for a careful reading of Section 18 will disclose that the proviso as to terminals is subordinate to no other provision of that section, except this one, "Nothing in this Section shall be construed as in any wise limiting or modifying the duty of a common carrier to establish joint rates, fares and charges for the transportation of passengers, freight and property over the lines owned, operated, controlled and leased by it and the lines of other common carriers, nor as in any manner limiting or modifying the power of the Commission to require the establishment of such rates, fares and charges." The Legislature in framing this Act no doubt had in mind an observance of the principle that while the State has power to regulate intrastate commerce, this power must be so exercised as not substantially to impugn upon or conflict with the regulations of interstate commerce by Congress. Intrastate regulation must harmonize with interstate regulation, if it does not, the latter prevails.

184 Fed. 770, Sheppard vs. N. P. Rwy. Co. This harmony can best be obtained by use of the joint rate.

The order of the Commission abolishes the rates existing for transportation in intrastate commerce from and to the spurs, tracks, junctions, yards and terminals of the railroads located within the switching district. It then orders that the switchings be done by the roads and done at the rates named. One of the claims of the roads is that the order of the Commission is in conflict with Section 18 of the Act, which reads as follows:

"Every common carrier is required to afford all reasonable, proper and equal facilities for the interchange of

passengers, freight and property traffic between the lines owned, operated, controlled or leased by it and the lines of every other common carrier, and for the prompt transfer of passengers and for the prompt receipt and forwarding of freight and property to and from its said lines; and no common carrier shall in any manner discriminate in respect to rates, fares or charges, or in any respect, to any service or in respect to any charges or facilities for any such transfer in receiving or forwarding between any two or more common carriers or between passengers, freight or property destined to points upon the lines of any two or more common carriers, or in any respect with reference to the passengers, freight or property transferred or received from any two or more other common carriers. *This section shall not be construed to require a common carrier to permit or allow any other common carrier to use its tracks* or terminal facilities. Every common carrier, as such, is required to receive from every other common carrier, at a connecting point, freight cars of proper standard, and haul the same through to destination, if the destination be upon a line owned, operated or controlled by such common carrier, or if the destination be upon a line of some other common carrier, to haul any car so delivered through to the connecting point upon the line owned, operated, controlled or leased by it, by way of route over which such car is billed, there to deliver the same to the next connecting carrier. Nothing in this section shall be construed as in any wise limiting or modifying the duty of a common carrier to establish joint rates, fares and charges for the transportation of passengers, freight and property over the lines owned, operated, controlled and leased by it and the lines of other common carriers, nor as in any manner limiting or modifying the power of the commission to require the establishment of such joint rates, fares and charges. A railroad corporation and a street railroad corporation shall not be required to interchange cars except on such terms and conditions as the commission may direct."

The testimony shows that there is some transportation from the terminals of one road to the terminals of some other road, but comparatively not much, because of the high rates. Notwithstanding the clause in this section, viz: "This section shall not be construed to require a common carrier to permit or allow any other common carrier to use its tracks or terminal facilities," the Commission held that these terminals are open for this part of the business, and that inasmuch as the roads voluntarily do this part of the business their rates for it must be reasonable.

Some provisions of the Public Service Act are declaratory of the Common Law; for instance, that the carrier shall furnish adequate facilities to its shippers; others are in derogation to the Common Law; for instance, that the roads shall furnish adequate facilities for transfer of freight from its own line to that of some other carrier, and vice versa.

It will be well to inquire what are the duties of a common carrier.

"At common law a carrier is not bound to carry except on his own line, and we think it quite clear that if he contracts to go beyond, he may in the absence of statutory regulations to the contrary, determine for himself what agencies he will employ. His contract is equivalent to an extension of his line for the purposes of the contract, and if he holds himself out as a common carrier beyond so that he may be required to carry in that way for all alike, he may nevertheless confine himself to carrying by the particular route he chooses to use."

110 U. S. 680, Atcheson, &c., R. R. vs. D. N. R. R.

"Prior to Interstate Commerce Act, February 4, 1887, railway traffic in this country was regulated by principles of common law applicable to common carriers which demanded little more than that they should carry for all persons who applied in the order in which the goods were delivered at the particular station and that their charges should be reasonable. It was even doubted whether they were bound to make the same charge to all persons for same service."

145 U. S. 275, I. C. C. vs. B. & O. R. R.

"Subject to the two leading prohibitions that their charges must not be unreasonable, and that they shall not unjustly discriminate so as to give undue preference to persons or traffic similarly circumstanced, the Act to

regulate commerce leaves common carriers as they were at common law free to make special rates looking to the increase of their business, to classify their traffic, to adjust and apportion their rates so as to meet the necessities of commerce, and generally to manage their interests upon the same principles which are regarded as sound and adopted in other trades and pursuits."

209 U. S. 119, I. C. C. vs. Chicago, &c., R. R.

Section 18 is not new. It was taken from the Public Utilities Act of New York. It is substantially equivalent to the second paragraph of section 3 of the Interstate Commerce Act. This paragraph was in the first Act passed by Congress in 1887 and has remained unchanged ever since. The proviso in the latter Act reads as follows: "But this shall not be construed as requiring any such common carrier to give the use of its tracks or terminal facilities to another carrier engaged in like business." It thus appears that from the beginning Congress recognized that there is a distinction between the line of road and the terminal as far as interchange of traffic is concerned. And if this distinction is a substance and not a shadow, what is it? Of course, it is apparent, that if the Baltimore and Ohio transports a train of cars loaded with brick from Frederick to Baltimore, and then via Bay View Junction transfers it to Calvert Station, using its own locomotive and train crew, and then unloads and delivers the brick to the consignee, using its own employees to do it, this would come within said clause of section 18. But the fact that the train happens to be transported from Bay View Junction to Calvert Station by the engine and crew of the Baltimore and Ohio is not important. If the Northern Central is compelled to take all cars tendered at the Junction by the Baltimore and Ohio and transport them to Calvert Station, and there use its terminal for unloading and delivery, will not the Northern Central be excluded pro tanto from the use of its terminal for business coming over its own lines? The testimony shows that both the Pennsylvania Lines and the Baltimore and Ohio in and about their terminals and on the tracks within the switching district are sometimes congested with traffic. (Record, pp. 78, 110, 111, 438, 441, 452-3). If this be true, to compel either of these roads to receive cars from the other roads, and perform the other requirements in accordance with the order of the Commission, might be to take away the use of their terminals in a very effective manner.

The Northern Central and the Maryland and Pennsylvania both touch York. The Northern Central reaches the harbor and has large elevators there, and has terminals in different parts of the city. The Maryland and Pennsylvania Railroad has but one small terminal at North Avenue Bridge, does not reach the harbor and has no elevator. Should the Maryland and Pennsylvania be put in position to compete with the Northern Central Railroad for the trade between York and Baltimore by giving it the right of access to the Northern Central Railroad's terminal? It is apparent that the small road, without having spent one cent to reach the waterfront and to equip itself with a grain elevator, would be given this coign of vantage, if the switching rate is low enough to be absorbed by it. The injustice of this is accentuated when we consider in this connection section 23, in which it is provided that if in the judgment of the Commission repairs or improvements in any tracks, terminals, terminal facilities, &c., ought reasonably to be made in order to promote the convenience of the public, the Commission shall, after hearing, make an order directing such repairs and improvements to be made within a reasonable time and in a manner to be specified therein. It is obvious that if the Commission's order in this case is valid it has power to supplement that order by requiring the Northern Central Railroad to enlarge its terminals, if necessary, so as to accommodate the business of that road plus the business sent to its terminals by the Maryland and Pennsylvania Road.

To protect itself from such competition the road must, under the proviso, close its terminals to its competitors, or it must resort, as it does, to a switching rate sufficiently high to prevent its competitor from absorbing that charge.

We should keep in mind in considering this question that between the road and its own shippers no contention arises; as to these both its lines and its terminals are open; as against the

demands of these the proviso can afford no protection. Between the road and its shippers, the road is subject to regulation by the commission. But at common law the carrier could close its property to its competitor, it was bound, as we have seen, to carry only on its own line and was not bound to contract for carriage over any other lines or with them unless such other lines became shippers.

The other parts of section 18 require that the *line* shall be open to the competitor, but the *terminal never has been open to him*. In the Stockyards case, hereafter cited, it is said:

"The duty of the carrier to accept goods tendered at its station does not extend to the acceptance of cars offered to it at an arbitrary point near its terminus by a competing road for the purpose of reaching and using its terminal station."

The clause concerning terminals, section 18, is declaratory of the common law, because at common law the carrier could do what this clause permits the carrier to do. It is also declaratory of the legislative will, as much so as the other parts of that section. It can be abolished by repeal, but while it stands it must be given full force and vitality.

I am, therefore, of opinion that to prevent such competition for the road to seal up its terminal to its competitor as to this switching practice is not illegal.

In deciding that the terminals of the complainants are open and therefore subject to regulation, the commission adopted the views of the Interstate Commerce Commission.

Under these circumstances to say that the terminals are open, because they interchange traffic from the terminals of one road to terminals of another, and being open, that the switching rates in force are unreasonable and must be reduced, when such reduction is sufficient to enable the competitor to acquire the use of the terminal which the clause in question was designed to prevent is to nullify the clause or explain it away. It must be borne in mind also that there was no testimony offered before the Commission, or in this case, tending to prove that the rate fixed by the Commission is high enough to prevent its absorption by the competing road. The Com-

mission did not proceed upon this theory in dealing with the problem.

A case in point will be found in 23 I. C. C. 256, Public Service Commission vs. N. P. Ry., where high rate between Tacoma and South Tacoma was sustained by the Public Service Commission of Washington and the Interstate Commerce Commission for the purpose of preserving the valuable terminals of the Northern Pacific Railway in South Tacoma from competition with railroads who had no terminals in that part of the city. This case is apt, if there was in the Washington statute provision like the clause as to terminals in section 18 of our Act. It is far stronger if without such proviso the case was decided on general equitable grounds.

In the above case the railroad used the high rate for access to its terminal to prevent undue competition from its competitors. In the Stockyards case, hereafter cited, the railroad refused access to its terminals on any terms.

The right to the use of the terminal by the railroad to fulfill the object of its creation, to wit, *to carry for every shipper who offers his goods at any point on the line and make delivery at the point of destination is a common law right of property*. This, like other rights of property created by the common law, can not be taken away without due process of law, although such rights are held subject to reasonable regulation. Munn vs. Illinois, 94 U. S. 134.

It is true that as early as the license cases in 5 Howard 583, it was held that to regulate commerce within its own limits is the exercise of the police power of the State. It is true, also, as stated in Mugler vs. Kansas, 123 U. S. 661, that it belongs to the legislature to exert the police power, and to determine primarily what measures are appropriate and needful for the protection of public health, safety or welfare; but it is a contradiction in terms to say that a State agency created by the legislature for the exercise of the police power can exercise that power in a field as to which there is a limitation on the statute of its creation. For what is this proviso but a limitation on the power of the Commission? When the terminal provision of section 18 states "this statute shall not be construed to require a common carrier," etc., it refers to the jurisdiction

of the Commission, for it, by sections 2 and 3 of the Act had authority to *require* the railroad to perform the duties imposed upon it by this and other sections. This is made plain by the subsequent part of the section treating of joint rates, which ends thus: "Nor as in any manner limiting or modifying the power of the Commission to *require* the establishment of such joint rates, fares and charges."

Does the order of the Commission violate the due process of law clause of the Fourteenth Amendment? A case directly in point here will be found in 212 U. S. 139, L. & N. R. R. vs. Stockyards Co. A section of the Constitution of Kentucky covering about the same subject matter as section 18 of our Act contains this proviso:

"But this section shall not be construed as requiring any such common carrier to allow the use of its tracks for the trains of another engaged in like business."

The Central Stockyards is situated on the Southern Railway and the Bourbon Stockyards is on the Louisville and Nashville, both in the suburbs of Louisville. The order of the Commission directed the L. & N. to take stock from the Central Stockyards at the switching point consigned to the Bourbon Stockyards. The Supreme Court reversed this order. In doing so it said:

"There remains for consideration only the third division of the judgment which requires the plaintiff in error to receive at the connecting point, and to switch, transport and deliver all live stock consigned from the Central Stockyards to any one at the Bourbon Stockyards. This also is based upon the sections of the Constitution that have been quoted. If the principle is sound every road into Louisville, by making a physical connection with the Louisville and Nashville, can get the use of its costly terminals and make it do the switching necessary to that end upon simply paying for the service of carriage. The duty of a carrier to accept goods tendered at its station does not extend to the acceptance of cars offered to it at an arbitrary point *near* its terminals by a competing road for the purpose of reaching and using its terminal station. To require such an acceptance is to take its property in a very effective sense, and can not be justified un-

less the railroad holds that property subject to greater liabilities than those incident to its calling alone. The Court of Appeals did not put its decision upon any supposed *special* liability, but on the *broad ground* that the State Constitution requires it and lawfully may require it of a common carrier by rail. Therefore, the judgment must be reversed."

See also No. Pac. R. R. vs. I. C. C., 216 U. S. 538.

The petition filed before the Commission made the Baltimore and Ohio Railroad, the Pennsylvania Lines and the Western Maryland Railroad defendants: for some reason not made plain the Maryland and Pennsylvania was not made a party to the proceeding. The Baltimore and Ohio and Pennsylvania Lines have many terminals well located and well equipped; the Western Maryland has very little track within the city limits and but one terminal, not well located and not well equipped; but it uses the tracks of the Union Railroad and the terminals of the Northern Central Railroad by contract. The Maryland and Pennsylvania has one small terminal at North Avenue Bridge. In its answer to the petition the Western Maryland denies that it maintains switching rates. This probably means that cars to be switched to and from this road are taken to and from the terminals on the Union Railroad by the Northern Central Railway for the Western Maryland, as any transportation for such switching purposes must be done over the tracks of the Pennsylvania Lines. The Western Maryland having spent but little for terminals will be benefited by the Commission's order as stated by Mr. George R. Gaither at the "Conference" (page 5B2). It is for this reason, no doubt, that the Western Maryland has not resorted to this Court along with the Baltimore and Ohio and the Pennsylvania Lines. If the order goes into operation and the Maryland and Pennsylvania is benefited, of which I have no doubt, it will of course seek to have the order extended to its road, which it would have a clear right to do.

The foregoing observations do not apply to that part of the Commission's order fixing a rate of $1 for yard switching and a rate of not over $5 for industrial switching. These movements do not require transportation

off of the tracks of the first carrier. The proviso as to terminals in section 18 can have no influence on these requirements. I am not convinced that these rates are confiscatory or unreasonable; they, therefore, come within the principle laid down in Wilcox vs. Con. Gas Co., 212 U. S. 42, that where there appears to be a narrow margin between possible confiscation and proper regulation, and the result depends on future operation, the Court should not enjoin the enforcement of the order before there has been a fair trial of the new rate. As to these provisions the preliminary injunction will be dissolved, and the bill will be dismissed without prejudice.

In accordance with the foregoing views the preliminary injunction should be made permanent as to that part of the order of the Commission which provides for connecting line switching and intermediate switching.

Since the close of the argument of these cases application has been made by the Commission to have a copy of the testimony taken in these proceedings transmitted to it, and this proceeding staid pursuant to section 44 of the Act, for the reason that the testimony taken in this proceeding is different from and additional to that taken before the Commission. The testimony tending to prove that there is danger of congestion of traffic on the tracks and at the terminals of complainants, if the order of the Commission is put into operation, is germane and important, and is additional within the meaning of this section, as that testimony was not adequately offered in the proceeding, is different in other respects.

This will be so ordered.

---

NORTHERN CENTRAL RAILWAY
COMPANY ET AL.
VS.
PHILIP D. LAIRD ET AL.

---

It is ordered by the Circuit Court No. 2 of Baltimore City, this 26th day of March, 1913, that a copy of the testimony taken in this proceeding be transmitted by the Clerk to the Public Service Commission, and that .further proceedings in this action be staid for fifteen days.